J. Christopher Jaczko (149317)
Allison H. Goddard (211098)
JACZKO GODDARD LLP
4401 East Gate Mall
San Diego, CA  92121
Telephone:     (858) 550-6150
Facsimile:      (858) 225-3500

Raymond P. Niro (*Pro Hac Vice*)
Raymond P. Niro, Jr. *(Pro Hac Vice)*
Matthew G. McAndrews (*Pro Hac Vice*)
Dina M. Hayes (*Pro Hac Vice*)
Frederick C. Laney (*Pro Hac Vice*)
NIRO, SCAVONE, HALLER & NIRO
181 West Madison Street, Suite 4600
Chicago, Illinois  60602
Telephone:     (312) 236-0733
Facsimile:      (312) 236-3137

Attorneys for Plaintiff/Counter-Defendant
DR SYSTEMS, INC.

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| DR SYSTEMS, INC., a California corporation,<br><br>             Plaintiff,<br><br>v.<br><br>FUJIFILM MEDICAL SYSTEMS USA, INC., GE HEALTHCARE LTD, GE MEDICAL SYSTEMS, INC., KONINKLIJKE PHILIPS ELECTRONICS N.V., PHILIPS ELECTRONICS NORTH AMERICA CORPORATION, MCKESSON CORPORATION, AGFA-GEVAERT N.V., AGFA CORPORATION, DYNAMIC IMAGING, LLC, SIEMENS MEDICAL SOLUTIONS USA, INC., SIEMENS CORPORATION, SIEMENS AG AND EASTMAN KODAK COMPANY,<br><br>             Defendants.<br><br>AND RELATED CROSS-ACTIONS. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No.: 06cv0417 B (NLS)<br><br><br> **Date:  February 27 & 28, 2007**<br>**Judge: The Hon. Rudi M Brewster**<br><br><br>**DR SYSTEMS' OPENING BRIEF SUPPORTING ITS CLAIM CONSTRUCTIONS FOR THE '416 PATENT** |

**TABLE OF CONTENTS**

I.     INTRODUCTION ............................................................................ 1

II.    THE MEDICAL IMAGE VIEWING SYSTEM ................................. 1

III.   THE RULES OF CLAIM CONSTRUCTION .................................. 2

A.   A PERSON OF SKILL IN THE RELEVANT ART ........................... 4

B.   CLAIM 1 OF THE '416 PATENT ...................................... 4

1.   "system for presenting images" ...................................... 5

2.   "means including one or more display monitors for displaying at least one display container" ...................................... 5

3.   "means for storing an image database" ........................... 6

4.   "image database" ...................................................... 7

5.   "the images being separated into a plurality of image groups" ................... 8

6.   "indexed" ............................................................ 9

7.   "unique group identifier" .......................................... 9

8.   "each image series being ordered by assignment to each image in the image series of a numerical position in a respective monotonically changing sequence" ...................... 10

9.   "physician data tables" ............................................ 11

10.  "physician identifier" ............................................. 12

11.  "output function" .................................................. 13

12.  "display format" ................................................... 16

13.  "means for receiving a physician identifier" ................... 17

14.  "means for receiving a group identification" ................... 18

15.  "means connected to the means for receiving, to the means for storing an image database and to the means for displaying at least one display container and responsive to a physician identifier and to a group identification for retrieving at least one image series of an image group indexed by the group identification and for displaying the at least one image series in one or more presentation areas of the plurality of presentation areas in a display format contained in the physician data tables" ................ 18

16. "retrieving at least one image series of an image group" ............................ 22

17. "means for providing an output from the system according to an output function specified in the physician data tables" ........................................................ 23

C.  CLAIM 2 OF THE '416 PATENT ........................................................................ 25

1. "means for ordering the display of the at least one image series in response to mode specification" ........................................................................................................ 25

D.  CLAIM 3 OF THE '416 PATENT ........................................................................ 27

1. "means for synchronizing the presentation of each image series of two or more image series such that whenever the display of one image series of the two or more image series is changed to display a next image in the order of its respective sequence, each other image series of the two or more image series is correspondingly changed" ...... 27

E.  CLAIM 5 OF THE '416 PATENT ........................................................................ 29

1. "means for displaying a palette display container on the one or more display monitors" ................................................................................................................ 29

2. "means for selecting an image of an image series displayed in the at least one display container and reproducing the selected image" ........................................... 29

F.  CLAIM 6 OF THE '416 PATENT ........................................................................ 32

1. "means connected to the storage subsystem and to the at least one display container for retrieving images from the image database and displaying retrieved images in the at least one display container" ...................................................................... 32

2. "data table" ...................................................................................................... 33

3. "output preferences" ........................................................................................ 33

4. "mode preferences" .......................................................................................... 35

5. "outputting images" ......................................................................................... 37

G.  CLAIM 11 OF THE '416 PATENT ..................................................................... 37

1. "monitor means for presenting graphical images" ........................................... 37

2. "means for displaying a first display container and a second display container on the monitor means" .............................................................................................. 37

3.   "application means" .......................................................................................... 38

H.   CLAIM 14 OF THE '416 PATENT ................................................................ 40

1.   "application means" .......................................................................................... 40

IV.  CONCLUSION ............................................................................................................ 41

## I.  INTRODUCTION

Plaintiff DR Systems, Inc. ("DR Systems") submits its claim construction for U.S. Patent No. 5,452,416, entitled "Automated System And A Method For Organizing, Presenting, And Manipulating Medical Images" that will be discussed at the February Markman hearing (Exhibit A).[1]  The purpose of this brief is to assist the Court in resolving the legal issues surrounding the construction of the disputed claim terms.  The parties have filed a Joint Claim Construction Chart consistent with this Court's Order in which the agreed and disputed terms are identified.

## II.  THE MEDICAL IMAGE VIEWING SYSTEM

The invention of the '416 patent provides efficient, user-friendly, and physician-specific systems and processes for presenting and viewing medical images generated by any of a variety of imaging devices – e.g., x-ray, MRI, PET, CAT, etc.  Although automated systems for archiving, retrieving, and presenting medical images existed prior to the invention of the '416 patent, such systems were not adapted to the special needs and personal preferences of radiologists who must analyze and consider medical images in particular ways for special purposes.  At the time of the invention of the '416 patent, there existed a need for an automated system for presenting and viewing medical images that accommodated the highly personal mode of examination of individual radiologists.  The invention of the '416 patent fulfilled this need.  In particular, and among other unique features, the invention provided diagnosing physicians with the ability to "personalize" their analyses of medical images through physician-specific "output functions" and "display formats."  In addition, some of the inventions enable referring physician preferences – i.e., "output preferences" – that define how a referring physician should receive images after the diagnosing physician completes the examination.

The invention of the '416 patent provides for physician-specific output functions, which facilitate – according to a diagnosing physician's pre-selected preferences – the presentation of images in one of at least two modes of image presentation.  As described in the specification of the '416 patent, two examples of presentation modes are "monitor mode" and "series mode."  In monitor mode, a series of images is presented sequentially in a single display area on a viewing

---

[1]  Relevant portions of the prosecution history of the '416 patent are attached as Ex. B.

monitor.  In series mode, each image of an image series is presented one at a time in a single "presentation area" or a plurality of presentation areas.  Thus, based on his or her pre-selected preferences, a diagnosing physician has the flexibility of viewing medical images in either of these modes.

Another feature of the invention of the '416 patent – physician-specific display formats – enable a physician to determine the number of rows and columns in a matrix of viewable images based on the physician's pre-selected preferences.  The physician is not required to reformat the image matrix each time the physician accesses the image series.  Instead, the physician's preferred display format is stored and will be presented the next time the physician accesses the image series.  The invention of the '416 patent also provides for physician-specific output preferences.  With such output preferences, physicians may define and configure the medical image viewing system to provide images from a diagnosing physician to a referring physician in a particular manner.

## III.   THE RULES OF CLAIM CONSTRUCTION

The basic rules of claim construction are familiar to patent lawyers and judges. As a result, DR Systems will not repeat all of the well established principles.  Instead, those rules which have particular significance to this proceeding are summarized below.

As with most patent cases, DR Systems and Defendants dispute whether the identified phrases in the '416 patent have their ordinary and customary meaning given by persons of ordinary skill in the art at the time of the invention or a meaning limited to the disclosed preferred embodiment.   Thus, it important to clarify the law regarding the role of the specification in construing claims.

The Federal Circuit Phillips v. AWH Corp., 415 F.3d 1303, 1314 (Fed. Cir. 2005), decision clarified that, when construing claims, the primary focus remains on the claims, both asserted and unasserted.  "Differences among claims can also be a useful guide [also] in understanding the meaning of particular claims terms." Id.  For example, the doctrine of claim differentiation creates a rebuttable presumption that each claim in a patent has different scope. Sunrace Roots Enter., Co. v. SRAM Corp., 336 F.3d 1298, 1302-1303 (Fed. Cir. 2003).  That

presumption, however, "is especially strong when the limitation in dispute is the only meaningful difference between an independent claim and dependent claim, and one party is urging that the limitation in the dependent claim should be read into the independent claim." Id. at 1303.

Although the specification is the single best source for understanding the meaning of the claims, it cannot be used as a tool to redefine otherwise understood phrases and terms. Phillips, 415 F.3d at 1323.  "For instance, although the specification often describes very specific embodiments of the invention, [the Federal Circuit] has repeatedly warned against confining the claims to those embodiments." Id.  "That is not just because section 112 of the Patent Act requires that the claims themselves set forth the limits of the patent grant, **but because persons of ordinary skill in the art rarely would confine their definitions of terms to the exact representations depicted in the embodiments**." Id. (emphasis added).  "In sum, subject to any clear and unmistakable disavowal of claim scope, the term[s] . . . take the full breadth of [their] ordinary meaning . . . ." Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc., 381 F.3d 1111, 1120 (Fed. Cir. 2004).  "And, even where a patent describes only a single embodiment, claims will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction." Id. at 1117.

Finally, Defendants attempt to construe the means-plus-function claims to include more structure than is required to perform the recited functions.  The Federal Circuit has cautioned, however, that "courts may not import functional limitations that are not recited in the claim, or structural limitations from the written description that are unnecessary to perform the claimed function." Wenger Manuf., Inc. v. Coating Mach. Sys., 239 F.3d 1225, 1233 (Fed. Cir. 2001).  In the Wenger Mfg. case, the Federal Circuit rejected the district court's importation of structure that was not necessary to perform the recited function.  The claim called for an "air circulation means." Wenger Mfg., 239 F.3d at 1233.  Noting that the preferred embodiment only showed a device that recirculated air, the court held that the structure required a device that could recirculate air. Id.  Reversing the district court, the Federal Circuit noted that "the court improperly restricted the 'air circulation means' limitation to structure that was disclosed in the

preferred embodiment, but was not necessary to perform the recited function of circulating air." Id. Moreover, the corresponding structure for a particular function must actually perform the recited function. Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc., 145 F.3d 1303, 1308-09 (Fed Cir. 1998). Structural features that do not actually perform the recited function or merely enable the corresponding structure to operate as intended do not constitute corresponding structure and thus do not serve as claim limitations. Id.; Asyst Tech., Inc. v. Empak, Inc., 268 F.3d 1364, 1371 (Fed. Cir. 2001).

While other legal principles apply, DR Systems has only highlighted a few predominant ones that have particular relevance to this case. DR Systems intends to expand on the application of the others during the upcoming Markman hearing.

DR Systems has asserted infringement of independent claims 1-3, 5-11, and 14. Defendants have denied infringement.

### A.   A PERSON OF SKILL IN THE RELEVANT ART

The technology disclosed in the '416 patent relates to a computer system designed to allow radiologists to preset their desired mode of presenting medical images on a monitor. As such, a person working in this field typically has experience in computer programming and working with medical imaging devices. At the time the inventions of the '416 patent were created, two of the inventors in this case had received formal training in computer programming and computer technology and the third was a practicing radiologist. Similarly, all of the cited prior art references relate to either medical imaging technology and/or computer systems. As a result, DR Systems asserts that a person of ordinary skill in the art is one who generally has a B.S. degree in Computer Science and at least two years of experience working with medical imaging technology or equivalent experience in the field of digital medical imaging.

### B.   CLAIM 1 OF THE '416 PATENT

The '416 patent is generally directed to an automated system for storage, retrieval, and presentation of medical images which is especially adapted for the presentation of medical image sequences and which affords the diagnosing radiologist with a flexible and responsive set of functions that permit direct manipulation of the modes of image presentation.

1

### 1.     "system for presenting images"

DR Systems asserts that this term does not need construing, but, to the extent it is construed, DR Systems' proposed construction for this term is "a personal computer or workstation, its software, peripherals, a storage device and a monitor for outputting images." Defendants propose the following construction: "a personal computer or workstation, its software, peripherals, on-line storage and monitor."  Because both constructions are essentially the same except that Defendants omit the "for outputting images" language, the dispute is whether this language is appropriate.  DR Systems' proposed construction is the correct one because it is the most complete definition that gives meaning to all the words of the phrase – namely, "for presenting images."

In addition, DR Systems' proposed construction accurately represents the context in which this language appears and the claimed invention's objective to provide an automated system that outputs images on a monitor for examination by a radiologist. DR Systems' proposed construction is likewise consistent with the specification.  The '416 specification states that "the system includes a DOS-based personal computer or workstation 10 which has the capability to concurrently execute an application process 12 and a plurality of interface processes 14" ('416; col. 4, lns. 60-67) (Exhibit A) and that the "application process 12 [of the DOS-based personal computer] further specifies how and which images in the working memory 33 are to be output on the monitors 26, 27, and 28" ('416; col. 5, lns. 64-67).

### 2.     "means including one or more display monitors for displaying at least one display container"

DR Systems asserts that this element is not a means-plus-function element.  Because the word "means" is used in this element, Federal Circuit law presumes that it is a means-plus-function element.  But, Federal Circuit precedent also holds that this presumption is overcome when the claim discloses sufficient structure to perform the recited function.  In this case, the presumption is overcome because the recited "one or more display monitors" provides sufficient structure to perform the identified function of displaying images output from the system.

1    Several statements in the specification confirm that one skilled in the art would

2    understand that a monitor performs the function of displaying images output from the system.

3    For example, the specification states that: (1) "and output device 25 in the form of a multi-screen

4    apparatus provides the means by which the images stored in the image database 24 are arranged

5    and presented to a practitioner for examination, manipulation, and disposition. In the preferred

6    embodiment, the device includes three separate monitors 26, 27 and 28 . . ." ('416 patent; col. 5,

7    lns. 23-27) (Exhibit A) ; (2) the "application process 12 [on the DOS-based personal computer]

8    further specifies how and which images in the working memory 33 are to be output on the

9    monitors 26, 27, and 28" ('416 patent; col. 5, lns. 64-67) (Exhibit A); (3) "a display container

10   such as that illustrated in FIG. 3 is output on all but one of the monitors or monitor equivalents

11   supported by the system" ('416 patent; col. 7, lns. 16-23) (Exhibit A); (4) "a display container

12   comprising a rectangular array of rectangular presentation areas is displayed on one or more

13   monitors" ('416 patent; col. 7, lns. 36-38) (Exhibit A); and (5) "[t]he system includes a plurality

14   of monitors in which all monitors, save one, produce display containers for image series

15   presentation" ('416 patent; Abstract. See also, Exhibit C, a cited prior art reference U.S. Patent

16   No. 5,235,510; col. 8, lns. 13-15 (identifying a CRT (or monitor) as displaying medical images)).

17   Although there are other remarks supporting DR Systems' position, these alone provide

18   sufficient evidence supporting DR Systems' position that a monitor is sufficient structure for

19   performing the recited function of displaying images output from the system.  Therefore, the

20   claim element is not a means-plus-function element.

21                    **3.      "means for storing an image database"**

22   The parties agree that this element is written in means-plus-function form.  As such,

23   patent law requires first identifying the function and second identifying the structure disclosed

24   for performing that function.  First, the function is to save information for later recall.  This

25   construction is supported by the ordinary meaning and the specification.  According to the IBM

26   Dictionary of Computing, Ninth Edition (1991), p. 545 (Exhibit D), "storage" means "[a]

27   functional unit into which data can be placed, in which they can be retained and from which they

28   can be retrieved" (Ex. D)  Likewise, that dictionary defines "store" as "to place data in a storage

device" and a "storage device" is defined as "[a] functional unit into which data can be placed, in which they can be retained, and from which they can be retrieved." Id., at pp. 546-7.  Consistent with the plain meaning of this function, the specification states several times that the objective of the disclosed invention is to retain information for later recall: "[t]he invention is intended to operate in connection with an image database which stores medical images for retrieval and presentation" ('416 patent; col. 4, lns. 25-27) (Exhibit A); and "FIG. 6 illustrates the structure of the image database which enables the efficient storage and retrieval of image series" ('416 patent; col. 8, lns. 24-26) (Exhibit A).   Thus, the function is correctly defined as saving information for later recall.

Second, the structure for performing this function is a storage device.  The '416 specification clearly links the "means for storing an image database" to a storage device in column 5, lines 17-20, by stating "[a]n image database includes one or more conventional on-line storage devices for storage of medical image data representations . . . ."  A "storage device" identifies sufficient structure for the function of saving information for later recall to a person skilled in the art.  This fact is supported by the fact that the IBM Dictionary of Computing, Ninth Edition (1991), p. 546 (Exhibit D), identifies a "storage device" as "[a] functional unit into which data can be placed, in which they can be retained, and from which they can be retrieved." M.I.T v. Abacus Software, 462 F.3d 1344, 1355 (Fed. Cir. 2006)(finding that a dictionary can provide sufficient evidence that one skilled in the art would understand a term as identifying sufficient structure).

### 4.       "image database"

DR Systems proposes construction for this term is "a collection of computerized information that enables storage and retrieval of images."  This definition is consistent with the understood meaning of "database" and the context in which "image database" is used throughout the '416 patent claims and specification.  The term "image database" appears in the context of the claims to describe computerized information that is stored for later retrieval in the "means for storing" ('416 patent, col. 18, lns. 22-35) (Exhibit A).  Specifically, the claims state that the image database includes "a plurality of images of anatomical structures," which are further

1   described as being stored in a particular arrangement (i.e., an image group that includes image

2   series) (Id.).   Consistent with DR Systems' proposed construction, the Examiner understood

3   "image database" as a collection of computerized information: "what form of 'system' element is

4   the collection of pure information recited as 'an image database'?" (See Exhibit B, '416 File

5   History; p. DR 00165) (Exhibit B).   As such, the "image database" is clearly a collection of

6   computerized information.

7          Further, the specification states the "image database" allows for storage and retrieval of

8   images: "[t]he invention is intended to operate in connection with an image database which

9   stores medical images for retrieval and presentation" ('416 patent; col. 4, lns. 25-27) (Exhibit A);

10  "[t]he image subsystem 14c accesses the image database 23 for retrieval of stored images" ('416

11  patent; col. 5, lns. 55-57) (Exhibit A); and "FIG. 6 illustrates the structure of the image database

12  which enables the efficient storage and retrieval of image series" ('416 patent; col. 8, lns. 24-26)

13  (Exhibit A).   Similarly, the plain meaning of "database" indicates a "collection of data within a

14  given structure for accepting, storing, and providing, on demand, data for multiple users." Ex. D,

15  IBM Dictionary of Computing, Ninth Edition (1991), p. 137 (Exhibit D).   Therefore, the proper

16  construction for "image database" is "a collection of computerized information that enables

17  storage and retrieval of images."

18          **5.      "the images being separated into a plurality of image groups"**

19          DR Systems asserts that this phrase does not need construing, but, to the extent it is, DR

20  Systems' proposed construction for this phrase is "assigning images an identifier that is specific

21  to a particular group of the two or more image groups."   The context and ordinary meaning of

22  this phrase indicates that the images are assigned to image groups and that there is two or more

23  image groups in the image database.

24          The preferred embodiment further illustrates that the images from an exam are assigned

25  to an image group through the use of an identifier.   For example, the description of the preferred

26  embodiment reads as follows:

27          Each examination file 53 identifies an image group including one or more image

28          series obtained during an examination. Each image series in an image group is

indexed to a set of sequentially named or numbered files in which the images of the series are contained. For example, in the ROOTNAME. PAT file 53 illustrated in FIG. 6, the image group includes axial T1, axial T2, and sagittal T1 series.

('416 patent; col. 8, lns. 40-47) (Exhibit A). As the above description shows, an image group is given an identifier (e.g., ROOTNAME) and that identifier is used to identify all the images that are contained within the group. Although the preferred embodiment uses filenames to assign images to a particular group, the claims are not limiting in this manner. Instead, the claims only require that the medical images be divided into groups, regardless of the identifier that is used to accomplish this requirement. As such, the proper construction for this element is "assigning images an identifier that is specific to a particular group of the two or more image groups."

### 6. "indexed"

DR Systems' proposed construction for "indexed" is "using one piece of information to locate other information." In other words, an index provides a relationship between two different pieces of information. This is consistent with the generally understood definition which defines an index as "[a] list of the contents of a file or of a document, together with keys or references for locating the contents." Exhibit D, IBM, Ninth Edition (1991), p. 277. The context in which the term "indexed" first appears in the claims also supports DR Systems' position – "each image group is indexed by a unique group identification" ('416 patent; col. 18, lns. 26-27) (Exhibit A). As the plain language of this phrase indicates, an index allows one piece of information (i.e., unique group identification) to locate other information (i.e., an image group).

### 7. "unique group identifier"

DR Systems' proposed construction for "unique group identifier" is "information associated with a particular image group to the exclusion of all other image groups." This is the plain and ordinary meaning. In context, this phrase appears as "each image group is indexed by a unique group identification" ('416 patent; col. 18, lns. 26-27) (Exhibit A). As stated above, the "unique group identifier" is information that is used to locate a specific image group, which is represented by the phrase "<u>each</u> image group." The plain meaning of "unique" is "being only

one." Exhibit E, Webster's Ninth New Collegiate Dictionary, 9th Ed. (1988), p. 1290.   The ordinary meaning of "identifier" is "a sequence of letters, digits, and underscores used to identify a data object or function." Exhibit D, IBM Dictionary of Computing, Ninth Edition (1991), p. 270.  And clearly, "group" is referring to the image group previously identified in the phrase. Thus, the ordinary meaning of each of these words supports DR Systems' position.

The preferred embodiment's use of this identifier is likewise supportive.  Specifically, the specification states that the information derived from an examination is used to create a unique composite patient identifier (ROOTNAME), thus, a patient is given a unique identifier (ROOTNAME) for each examination ('416 patent; col. 8, lns. 26-33) (Exhibit A).  The creation of the unique group identifier is described as important because it preserves the unique identity of the image group ('416 patent; col. 9, lns. 1-3) (Exhibit A).  As a result, "[f]or any given ROOTNAME, an image series can be identified by reference to the ROOTNAME file 53 and manipulated, as a unit and independently of any other image series, by the system of FIGS. 1 and 2. This provides a very significant advantage over existing systems which treat each image as an independent unit, unconnected with any other image in its sequence or with any other image in any other series or group" ('416 patent; col. 9, lns. 3-11) (Exhibit A).  Thus, the specification also makes it clear that the "unique group identifier" is "information associated with a particular image group to the exclusion of all other image groups" that allows the group to be treated as an independent unit.

8. **"each image series being ordered by assignment to each image in the image series of a numerical position in a respective monotonically changing sequence"**

DR Systems asserts that this phrase does not need construing, but, to the extent it is, DR Systems' proposed construction for this phrase is "each image in a collection of images is assigned a numerical value representing its order in the sequence."  This is the plain meaning of this phrase and it is consistent with the description in the preferred embodiment.  Specifically, the example provide in that embodiment is described as follows:

1  For example, in the ROOTNAME. PAT file 53 illustrated in FIG. 6, the image

2  group includes axial T1, axial T2, and sagittal T1 series. The axial T1 series

3  consists of n consecutively-numbered files, each containing a respective image of

4  the series such that the sequence position of the named file corresponds to the

5  sequence position of the image it contains. The image files are named

6  ROOTNAME. XXX. Thus, image 1 in the axial T1 series has a file name

7  ROOTNAME.1, the second image in this series is in a file named

8  ROOTNAME.2, and so on. Similarly, the n images of the axial T2 series are

9  stored in files consecutively numbered as ROOTNAME. m through

10  ROOTNAME. (m+n).

11  ('416 patent, col. 8, lns. 45-57) (Exhibit A).  Consistent with DR Systems' proposed

12  construction, this portion of the specification demonstrates that "each image in a collection of

13  images is assigned a numerical value representing its order in the sequence."

14      **9.      "physician data tables"**

15      DR Systems' proposed construction for "physician data tables" is "an arrangement of

16  data that is specific to a particular diagnosing physician and in the form suitable for ready

17  reference."  The ordinary meaning of the terms "data" and "table" demonstrate that this phrase

18  relates to an arrangement of information in a form suitable for ready reference and the preamble

19  makes it clear that "physician" is referring to a "diagnosing physician."  "Data" is a "re-

20  interpretable representation of information in a formalized manner suitable for communication,

21  interpretation, or processing" and a "table" is an "array of data each item of which can be

22  unambiguously identified by means of one or more arguments." Ex. D, IBM Dictionary of

23  Computing, Ninth Edition (1991), pp. 137, 569 (Exhibit D).  And the preamble of claim 1 makes

24  it clear that the described device is "for presenting images of anatomical structure for

25  examination by a diagnosing physician" ('416 patent; col. 18, lns. 14-15) (Exhibit A).  Thus, in

26  the context of claim 1, "physician data tables" is referring to "an arrangement of data that is

27  specific to a particular diagnosing physician and in the form suitable for ready reference."

28

This is also consistent with the description of the preferred embodiment, which shows an arrangement of data for a diagnosing physician that describes a particular physician's preferences, *inter alia*, for (1) organizing all the images in an image group on the display monitor (i.e., MODE) and (2) the number and arrangement of presentation areas on the display monitor (i.e., MATRIX) ('416 patent; col. 9, lns. 20-38) (Exhibit A).   When a particular diagnosing physician is identified to the application process of the DOS-based personal computer, it is able to use this information to locate the diagnosing physician's preferred MODE and MATRIX in the physician data table ('416 patent; col. 10, lns. 3-25).   Each of the multiple diagnosing physicians supported by the system will have their own data table.   This allows the system to accomplish one of its primary goals to provide a system that can automatically accommodate for each radiologist's "highly personal mode of examination" ('416 patent; col. 1, ln. 58 – col. 2, ln. 14) (Exhibit A).

### 10.    "physician identifier"

DR Systems' proposed construction for "physician identifier" is "information associated with a particular diagnosing physician to the exclusion of all other physicians."   The ordinary meaning of "identifier" is "a sequence of letters, digits, and underscores used to identify a data object or function."   IBM Dictionary of Computing, Ninth Edition (1991), p. 270 (Exhibit D). The preamble of claim 1 provides context for this phrase by clearly identifying the system as one "for presenting images of anatomical structure for examination by a diagnosing physician" ('416 patent; col. 18, lns. 14-15) (Exhibit A).   Thus, in the context of claim 1, "physician identifier" is referring to "information associated with a particular diagnosing physician to the exclusion of all other physicians."   This allows the system to identify which diagnosing physician is performing the examination and enables the system to automatically accommodate for each radiologist's "highly personal mode of examination."

The '416 specification describes, in the context of the preferred embodiment, that when a particular diagnosing physician is identified to the application process of the DOS-based personal computer, it is able to use this information to locate the diagnosing physician's preferred MODE and MATRIX in the physician data table ('416 patent; col. 10, lns. 3-25)

1  (Exhibit A).  Moreover, the specification states that "it is a primary objective of this invention to

2  provide an automated system for storage, retrieval, and presentation of medical images which is

3  especially adapted for the presentation of medical image sequences and which affords the user

4  with a flexible and responsive set of functions that permit direct manipulation of the modes of

5  image presentation . . . ." ('416 patent, col. 2, lns. 16-23) (Exhibit A).  Thus, consistent with the

6  specification, the physician identifier provides the system a way to determine <u>who the user is</u>

7  and, thereby, to provide the preferred mode of image presentation for that user.

8                    **11.      "output function"**

9        DR Systems' proposed construction for "output function" is "an action to be carried out

10  by a program to control the organization applied to all the images in an image group when

11  displayed for a diagnosing physician; for example, series or monitor mode."  The Background of

12  the Invention for the '416 patent describes the problem with pre-existing systems as follows:

13                    Even the addition of a directly-manipulated user interface in conventional

14           image storage and presentation systems does little to adapt these systems to the

15           special needs of radiologists who must consider and manipulate many images in

16           particular ways for special purposes. Furthermore, each radiologist has a highly

17           personal mode of examination. For example, one radiologist may wish to examine

18           a first sequence of transparencies in its entirety and then a second, related

19           sequence before trying to correlate between individual images of the sequences.

20           Another radiologist may wish to examine sequences in parallel by simultaneously

21           considering images taken of the same anatomical plane under different conditions

22           of exposure. Even currently-available database systems which have been adapted

23           for storage and presentation of radiological images have not automated the

24           presentation modalities of image series. Instead, a radiologist must provide for the

25           individual retrieval and presentation of each and every stored image. In these

26           systems, the images are individually identified and processed for storage and

27           presentation without correlation to other images in their respective sequences.

28

1     Furthermore, the existing systems do not provide for concurrent presentation of

2     related image series.

3          Moreover, the currently available automated image storage systems are

4     awkward and difficult to use, providing little in the way of means for direct

5     manipulation of image presentation formats and images which are displayed for

6     analysis.

7     ('416 patent; col. 1, ln. 53 – col. 2, ln. 13) (Exhibit A).  In the Summary of the Invention, the

8     '416 patent describes the primary objective of the invention as providing a radiologist with a

9     flexible responsive set of functions that permit direct manipulation of the modes of image

10     presentation and of the presented images themselves:

11          Therefore, it is a primary objective of this invention to provide an

12     automated system for storage, retrieval, and presentation of medical images which

13     is especially adapted for the presentation of medical image sequences and which

14     affords the user with a flexible and responsive set of functions that permit direct

15     manipulation of the modes of image presentation and of the presented images

16     themselves.

17     ('416 patent; col. 2, lns. 16-24) (Exhibit A).  This statement is important because it demonstrates

18     that the only function disclosed affecting the presentation of images to a radiologist is the

19     function that permits manipulation of the modes of image presentation.  As such, the invention is

20     able to accommodate a radiologist's "highly personal mode of examination."  Moreover, the

21     invention of Claim 1 specifies a database that is adapted for storage and presentation of

22     radiological images to automate the presentation modalities of image series.

23          In addition, in the description of the preferred embodiment under the section titled Image

24     Presentation, the specification makes clear that the "invention is concerned with the presentation

25     of one or more medical images for consideration, analysis, and disposal by a user such as a

26     radiologist.  The invention includes at least two modes for presenting medical image series"

27     ('416 patent; col. 6, lns. 55-59) (Exhibit A).  The specification then describes two types of modes

28     for presenting images; specifically, monitor mode and series mode.  Monitor mode describes an

organization applied to all the images in an image group in which an image series is presented in the order of its respective sequence in a single respective display container such that each presentation area of the single respective display container includes no more than one image – see Fig. 3 ('416 patent; col. 6, ln. 61 – col. 7, ln. 33) (Exhibit A).  Series mode describes an organization applied to all the images in an image group in which each image series is presented one image at a time in the order of its respective sequence in a single respective presentation area of the plurality of presentation areas – see FIG. 4 ('416 patent; col. 7, ln. 34 – col. 8, ln. 2) (Exhibit A).  As can be seen from the description of these two examples, both modalities of image presentation describe a specific organization applied to all images in an image group that are presented to a radiologist for examination.

In this context it becomes clear that the "output function" in a "system for presenting images of anatomical structure for examination by a diagnosing physician" is "an action to be carried out by a program to control the organization applied to all the images in an image group when displayed for a diagnosing physician; for example, series or monitor mode."

The ordinary meaning of these two words and the file history are also supportive of this position.  "Output" is a broad term that generally means "pertaining to a device, process, or channel involved in an output process, or to the associated data or states" and "function" is also a broad term that generally means "a specific purpose of an entity, or its characteristic action." IBM Dictionary of Computing, Ninth Edition (1991), p. 406, 244 (Exhibit D).  Thus, in the context of a system for presenting images to a diagnosing radiologist for examination with its primary objective being to provide flexible presentation modalities and in the context of being an entry in the diagnosing physician's data table, "output function" is action carried out by the application process for presenting images in an image group.  As described in the specification, once the display format (i.e., the arrangement of presentation areas in the display container) is set, the "application process then executes the appropriate presentation mode procedure" ('416 patent; col. 10, lns. 3-25) (Exhibit A).

Likewise, the Examiner's remarks during the prosecution of the '416 patent demonstrate that one skilled in the art understands "output functions" as being the presentation modalities.  In

the Examiner's September Office Action, the Examiner identified a prior art reference's ability to provide a doctor with many possible modalities as disclosing the "output function" element ('416 File History, DR000171-172) (Exhibit B).  The Examiner went on to clarify that he used the term "modality" to mean "mode of image series presentation" ('416 File History, DR000172) (Exhibit B).  Consistent with DR Systems' proposed construction, therefore, the Examiner understood "output function" to relate to "mode of image series presentation," which is the organization applied to all the images in an image group for each exam.

### 12.    "display format"

DR Systems' proposed construction for "display format" is "information setting forth for each diagnosing physician the number of rows and columns in the display container; for example a 2X2 or 4X4 matrix."  The ordinary meaning of "format" is "[a] specified arrangement of of such things as characters, fields, and lines, usually used for display, printout or files." IBM Dictionary of Computing, Ninth Edition (1991), p. 406, 244 (Exhibit D).  Consistent with this ordinary meaning, the parties agree that "format preferences" (used in claims 6, 11 and 14) is properly constructed as "prespecified number and arrangement of presentation areas in which a diagnosing physician prefers all image series be viewed."  Similarly, Claim 1 identifies the invention as having a display with at least one display container "including a display area subdivided into a plurality of presentation areas in a predetermined array" and that this predetermined array is defined by a display format in the diagnosing physician's data table – "displaying the at least one image series in one or more presentation areas of the plurality of presentation areas in a display format contained in the physician data tables" ('416 patent; col. 18, lns. 17-20, 48-51) (Exhibit A).  Moreover, the modifier "display" for "format" makes it clear that format is referring to the arrangement of presentation areas on the display.  Thus, the ordinary meaning and the context provided by Claim 1 demonstrate that "display format" is the arrangement (i.e., the number of rows and columns) of presentation areas in the display container.

This is also consistent with the description of the preferred embodiment in the specification.  For example, when describing the monitor mode example, the specification states

the "display container is subdivided into a rectangular array of 20 presentation areas" and, when describing the series mode example, the specification states "a display container comprising a rectangular array of rectangular presentation areas . . . includes four substantially rectangular presentation areas numbered 1, 2, 3, and 4" ('416 patent; col. 6, lns. 66-67, col. 7, lns. 35-40) (Exhibit A).  In addition, the specification describes that the predetermined array (i.e., matrix) is first set in an object list by the application process on the DOS-based personal computer once the diagnosing physician logs on to the system ('416 patent; col. 9, ln. 68 – col. 11, ln. 6) (Exhibit A).

Similar to DR Systems' proposed construction, the Examiner's comments during prosecution show that one skilled in the art understands "display format" as being the arrangement or array of presentation areas.  Specifically, he acknowledged that the prior art reference Yamada disclosed a "display format" that was a fixed-format, single-image display and that combining this reference with the prior art Cecil reference, which disclosed various image display patterns (such as a 4X3 array of images) would satisfy the flexible display format requirement of the claimed invention ('416 File History, p. DR000136-170) (Exhibit B).  The Examiner, therefore, also indicated that one skilled in the art would, in fact, understand "display format" as being "the number of rows and columns in the display container; for example a 2X2 or 4X4 matrix."

### 13.    "means for receiving a physician identifier"

The parties agree that this element is written in means-plus-function form.  As such, patent law requires first identifying the function and second identifying the structure disclosed for performing that function.  First, the parties' agreed function of this element is to "to input the physician identifier."   In other words, the function is to input information (i.e., physician identifier) into the system.  The structure linked to this function in the specification is a trackball mechanism, keyboard, user interface 14a and screen driver 14b.  Specifically, the '416 patent states "[t]he screen driver 14b is connected to the trackball mechanism 16 and the keyboard 22, passing inputs from these devices by conventional means directly to the user interface 14a" ('416

patent; col. 5, lns. 37-40) (Exhibit A).  One skilled in the art, therefore, understands that this structure could be used to input information such as a physician identifier.

14.   **"means for receiving a group identification"**

The parties agree that this element is written in means-plus-function form.  As such, patent law requires first identifying the function and second identifying the structure disclosed for performing that function.  First, the parties agree the function of this element is "to input a group identification."  In other words, the function is to input information (i.e., a group identification) into the system.  The structure linked to this function in the specification is a trackball mechanism, keyboard, user interface 14a and screen driver 14b.  Specifically, the '416 patent states: "[t]he screen driver 14b is connected to the trackball mechanism 16 and the keyboard 22, passing inputs from these devices by conventional means directly to the user interface 14a" ('416 patent; col. 5, lns. 37-40) (Exhibit A).  One skilled in the art, therefore, would know that this structure could be used to input information such as a group identification.

15.   **"means connected to the means for receiving, to the means for storing an image database and to the means for displaying at least one display container and responsive to a physician identifier and to a group identification for retrieving at least one image series of an image group indexed by the group identification and for displaying the at least one image series in one or more presentation areas of the plurality of presentation areas in a display format contained in the physician data tables"**

The parties agree that this element is written in means-plus-function form.  As such, patent law requires first identifying the function and second identifying the structure disclosed for performing that function.  Before defining the function of this element, it is helpful to first break this element into its two distinct parts; namely, its structural and functional parts.  First, this element begins by stating that the "means" is connected to (1) the means for receiving, (2) the means for storing an image database and (3) the means for displaying at least one display container.  Next, the element describes the function and purpose of this "means."  Specifically,

the "means" takes specific actions in response to the physician identifier and the group identification input through the "means for receiving" for the purpose of (1) controlling the retrieval of an image series from an image group in the "means for storing an image database" and (2) controlling the display format of presentation areas (i.e., the number of rows and columns of presentation areas in the display container; for example a 2X2 or 4X4 matrix) that will be output to "the means for displaying at least one display container." Notably, the context of this element establishes that the function of this "means" is not (1) to input information, or (2) to actually retrieve an image series, or (3) actually display presentation areas in a display format prescribed by the diagnosing physician's data tables. Each of those functions and corresponding structures are previously identified in Claim 1.

Instead, this "means" is an application process of the DOS-based personal computer that performs controlling functions dictated by the information input identifying a diagnosing physician and an image group. To represent this, DR Systems has proposed the following definition for its function: "to process the information derived from the physician identifier and the group identification to recover an image series for outputting to a monitor for presentation in a display format specific to the particular diagnosing physician." This identified function is consistent with the ordinary language of the claims, which identifies a means "**responsive to** a physician identifier and to a group identification **for retrieving** at least one image series of an image group indexed by the group identification **and for displaying** the at least one image series in one or more presentation areas of the plurality of presentation areas in a display format contained in the physician data tables."

The description of the structure identified to perform this function provides further support for DR Systems' construction for the function, as well as identifying the appropriate structure. The structure identified for performing this function is (1) an image subsystem and (2) a DOS-based personal computer or workstation which has the capability to concurrently execute an application process and a plurality of interface processes, in which the application process is written in the well-known C language. Support for this structure is provided by the following statements: (1) "In FIG. 1, the system includes a DOS-based personal computer or workstation

1   10 which has the capability to concurrently execute an application process 12 and a plurality of

2   interface processes 14. The application process which, preferably, is written in the well known C

3   language, embodies process and functions of the invention as described later in further detail"

4   ('416 patent; col. 4, lns. 60-67) (Exhibit A); (2) "The image subsystem 14c accesses the image

5   database 23 for retrieval of stored images. Image selection is made by the application process12

6   and indicated by control signals coupled to the image subsystem 14c. In response to control

7   signals which designate images to be retrieved, the image subsystem 14c obtains the data

8   representations of the specified images and enters them into a high-capacity working memory 33

9   as directed by the application process 12" ('416 patent; col. 5, lns. 55-64) (Exhibit A); (3) "The

10  decision 73 awaits selection of a patient . . . If a patient is selected, the positive exit is taken from

11  decision 73 and a search is conducted of the database for a ROOTNAME.PAT file for this

12  patient in step 74 . . . the ROOTNAME.PAT file is provided to the application process which

13  extracts the image group organization from the file in step 77, and passes the appropriate control

14  signals to the imaging system in step 78 to enable the imaging subsystem to copy the images

15  named in the ROOTNAME.PAT file from the image database to the main memory . . . When the

16  radiologist's name is identified . . . the format specification . . . in the same RADSTAFF.dB row

17  [is] provided to the application process 12 which enables it to initialize control blocks for each

18  monitor, as well as the object list, in step 80. The object list includes a full specification of the

19  graphics objects required in the first monitor for the . . . matrix size . . . specified in the

20  RADSTAFF.dB entry selected by the user" ('416 patent; col. 9, ln. 54 – col. 10, ln. 18) (Exhibit

21  A).

22          DR Systems does not include algorithm steps as part of the structure because the

23  identification of a DOS-based personal computer or workstation, which has the capability to

24  concurrently execute an application process and a plurality of interface processes, in addition to

25  identifying the well known C language software provide a person skilled in the art with sufficient

26  structure to perform this function.  As noted in Altiris, Inc. v. Symantec Corp., 318 F.3d 1363,

27  1376 (Fed. Cir. 2003), identifying a specific type of software is identifying structure.  How to

28  program the DOS-based personal computer with the C programming software is knowledge well

1   within those skilled in the art, and need not be specified by a particular algorithm. See, Intel

2   Corp. v. VIA Tech., 319 F.3d 1357, 1366-67 (Fed. Cir. 2003).

3        In other words, the naming of a specific type of computer – DOS-based personal

4   computer with the capability to concurrently execute an application process and a plurality of

5   interface processes – and a specific type of programming language software – the well known C

6   language software – satisfies the "special purpose computer" requirements articulated by the

7   Federal Circuit in its WMS Gaming, Inc. v. International Game Tech., 184 F.3d 1339 (Fed. Cir.

8   1999) and Harris Corp. v. Ericsson, Inc., 417 F.3d 1241 (Fed. Cir. 2005) cases.  In each of those

9   cases, the disclosed structure was a processor or CPU. WMS Gaming, Inc., 184 F.3d at 1348-49;

10   Harris Corp., 417 F.3d at 1241. Without any identification of a specific type of computer or

11   specific type programming software, the Court held that the recitation of "a computer" or "a

12   processor" programmed to carryout any algorithm to perform the recited function is too broad to

13   satisfy the requirements of §112 ¶6. Id.  Contrary to the disclosures at issue in those cases,

14   however, the '416 patent identifies a special purpose computer by specifying a specific type of

15   computer that uses DOS software with the capability to concurrently execute an application

16   process and a plurality of interface processes and on which application processes can be created

17   using the well known C language software.

18        This case is, therefore, analogous to the In re Dossel, 115 F.3d 942 (Fed. Cir. 1997) case.

19   In Dossel, the PTO found a claim to be invalid for failing to adequately disclose any

20   corresponding structure for the reconstruction function.  The Federal Circuit concluded that the

21   specification sufficiently disclosed a computer as corresponding structure. Dossel, 115 F.3d at

22   946.  Although the specification did not use the term "computer," it described a structure that

23   "receive[d] digital data, perform[ed] complex mathematical computations and output[] the

24   results to a display," and the Court concluded that one of skill in the art of medical imaging

25   would understand that a computer must be the structure to perform these functions. Id. at 946-47.

26   Further, although no code that the computer would use to perform the functions was disclosed,

27   the specification did explain that "known algorithms" could be used in the reconstruction

28   process. Id. at 946.  Relying on this representation, the Court did not require the disclosure of a

1   specific algorithm.  This is significant here because one of skill in the art (i.e., a person with a
2   Computer Science degree and at least two years of medical imaging experience) would be able to
3   create an application process to perform the recited function with the disclosed DOS-based
4   personal computer and the disclosed C language software.  As a result, the specific algorithm
5   disclosed is not a necessary part of the structure.

6   **16.**    **"retrieving at least one image series of an image group"**

7   DR Systems asserts that this phrase does not need construing, but, to the extent it is, DR
8   Systems' proposed construction for this phrase is: "recovering an image series of an image group
9   from the means for storing an image database (i.e., a storage device)."  This is the plain meaning
10  of this phrase and it is consistent with the description in the preferred embodiment. Specifically,
11  the example provide in that embodiment is described as follows:

12      "The image subsystem 14c accesses the image database 23 for retrieval of stored
13      images. Image selection is made by the application process12 and indicated by
14      control signals coupled to the image subsystem 14c. In response to control signals
15      which designate images to be retrieved, the image subsystem 14c obtains the data
16      representations of the specified images and enters them into a high-capacity
17      working memory 33 as directed by the application process 12" ('416 patent; col.
18      5, lns. 55-64) (Exhibit A); "The decision 73 awaits selection of a patient . . . If a
19      patient is selected, the positive exit is taken from decision 73 and a search is
20      conducted of the database for a ROOTNAME.PAT file for this patient in step 74 .
21      . . the ROOTNAME.PAT file is provided to the application process which
22      extracts the image group organization from the file in step 77, and passes the
23      appropriate control signals to the imaging system in step 78 to enable the imaging
24      subsystem to copy the images named in the ROOTNAME.PAT file from the
25      image database to the main memory . . ." ('416 patent; col. 9, lns. 54-68) (Exhibit
26      A) .

27  Consistent with DR Systems' proposed construction, this portion of the specification
28  demonstrates that the plain language should control.

17.    **"means for providing an output from the system according to an output function specified in the physician data tables"**

The parties agree that this element is written in means-plus-function form.  As such, patent law requires first identifying the function and second identifying the structure disclosed for performing that function.  First, the function is properly construed as "to process information in a diagnosing physician data table to determine and control how to generate an image series in a manner defined by an output function for the diagnosing physician."  Whereas the previous element described the process of controlling the recovery of at least one image series of an image group and establishing the number and arrangement of presentation areas that will be used on the monitor, this element describes the process for controlling the output of those images in defined presentation areas according to predefined organization applied to all the images in an image group.  Again, it is important to point out that this "means" does not actually display the images because that function is performed by the "means for displaying" or monitor.  Instead, this "means" controls how and which images are to be output on the monitor.

DR Systems' proposed function definition is not only consistent with the ordinary meaning, but it is also consistent with the description of the preferred embodiment.  Specifically, the preferred embodiment describes this function as follows: (1) "**The application process 12 further specifies how and which images in the working memory 33 are to be output on the monitors 26, 27, and 28**. Thus, the pixel information representing database images flows from the working memory 33, through the image subsystem 14c to the monitors 26, 27, and 28. **Control over the display apparatus 25 is provided by** the coupling mechanism 29 in the form of a **video card** which has separately accessed and separately controlled memories for Red, Green, and Blue pixels. These memories are indicated by reference numerals 29a, 29b, and 29c, respectively. The memories of the video card are controlled by a **low-level video controller** 14d, which receives control signals from the **image subsystem** 14c. The image subsystem 14c generates control input for the low-level controller 14d in response to control signals generated by the **application process** 12" ('416 patent; col. 5, ln. 64 – col. 6, ln. 12) (Exhibit A) (emphasis added); (2) "When the radiologist's name is identified in this manner, the format specification

1    and working palette matrix size in the same RADSTAFF.dB row are provided to the application

2    process 12 which enables it to initialize control blocks for each monitor, as well as the object list,

3    in step 80. The object list includes a full specification of the graphics objects required in the first

4    monitor for the mode . . . specified in the RADSTAFF.dB entry selected by the user. The first

5    monitor is then initialized with graphics and images in steps 81 and 82. Once the first monitor

6    has been initialized, the object list is updated for specifying tile graphics of the second monitor .

7    . The application process then executes the appropriate presentation mode procedure. In the

8    preferred embodiment, the monitors 26 and 27 in FIGS. 1 and 2 are formatted with display

9    containers of the specified mode and matrix size and populated with images . . . " ('416 patent;

10   col. 10; lns. 3-25) (Exhibit A);  (3) **"Once the series of an image group have been entered in**

11   **sequence order into the working memory 33 and the display containers have been**

12   **initialized**, the application process produces the appropriate image system control signals to

13   present an initial image display in the specified presentation mode. If, for example, the monitor

14   mode has been specified, graphics pixels for presenting a display container such as that

15   illustrated in FIG. 3 in the specified matrix size are entered into the . . . video card together with

16   image pixels for the first series of the image group. When the memory 29a is appropriated loaded

17   with graphics and image pixels, the application process issues a SELECT MONITOR control

18   signal to the low level controller 14d through the image subsystem 14c, which disables data entry

19   to the Red and Blue memories 29a and 29c and enables data entry into the Green memory 29b .

20   . At this point, display containers with images would be presented on the monitor 26 and on the

21   monitor 27 . . ." ('416 patent; col. 10, ln. 45 – col. 11, ln. 6) (Exhibit A) (emphasis added).

22          The above description not only supports DR Systems' construction for the function of

23   this element, it also identifies the structure (identified in bold) disclosed for performing that

24   function.   Namely, the above excerpts identify (1) a DOS-based personal computer or

25   workstation which has the capability to concurrently execute an application process and a

26   plurality of interface processes, in which the application process is written in the well-known C

27   language (see '416 patent; col. 4, lns. 60-67 (Exhibit A), which identifies the structure for the

28   application process), (2) an image subsystem, (3) a video card, and (4) a low-level controller.

Accordingly, DR Systems asserts that these are the structures for performing the recited function. For the same reasons discussed above in section 15, DR Systems asserts that the invention is not limited to the disclosed algorithm.

C.    CLAIM 2 OF THE '416 PATENT

1.    **"means for ordering the display of the at least one image series in response to mode specification"**

The parties agree that this element is written in means-plus-function form.  As such, patent law requires first identifying the function and second identifying the structure disclosed for performing that function.  The parties agree that the function is "ordering the display of the at least one image series in response to mode specification."   The disagreement is over the structure.  DR Systems asserts that the disclosed structure is "a DOS-based personal computer or workstation which has the capability to concurrently execute an application process and a plurality of interface processes, in which the application process is written in the well-known C language."  This structure is associated with the ordering of the display function by the following disclosure:

> In response to control signals which designate images to be retrieved, the image subsystem 14c obtains the data representations of the specified images and enters them into a high-capacity working memory 33 as directed by the application process 12. **The application process 12 further specifies how and which images in the working memory 33 are to be output on the monitors 26, 27, and 28** ('416 patent; col. 5, lns. 59-67) (Exhibit A) (emphasis added).

> When the radiologist's name is identified in this manner, the format specification . . . in the same RADSTAFF.dB row are provided to the application process 12 which enables it to initialize control blocks for each monitor, as well as the object list, in step 80. The object list includes a full specification of the graphics objects required in the first monitor for the mode . . . specified in the RADSTAFF.dB entry selected by the user. The first monitor is then initialized with graphics and images in steps 81 and 82. Once the first monitor has been

1   initialized, the object list is updated for specifying tile graphics of the second

2   monitor . . . **The application process then executes the appropriate**

3   **presentation mode procedure.** In the preferred embodiment, the monitors 26 and

4   27 in FIGS. 1 and 2 are formatted with display containers of the specified mode . .

5   . and populated with images  . . . The user interface 14a inspects the object list 34

6   to determine the graphics objects for which graphics pixels must be generated and

7   provided by the screen driver 14b. The screen driver 14b outputs the specified

8   graphics pixels in parallel to all of the memories 29a, 29b, and 29c . . . Once the

9   series of an image group have been entered in sequence order into the working

10   memory 33 and the display containers have been initialized, **the application**

11   **process produces the appropriate image system control signals to present an**

12   **initial image display in the specified presentation mode**. If, for example, the

13   monitor mode has been specified, graphics pixels for presenting a display

14   container such as that illustrated in FIG. 3 in the specified matrix size are entered

15   into the Red memory 29a of the video card together with image pixels for the first

16   series of the image group. When the memory 29a is appropriated loaded with

17   graphics and image pixels, the application process issues a SELECT MONITOR

18   control signal to the low level controller 14d through the image subsystem 14c,

19   which disables data entry to the Red and Blue memories 29a and 29c and enables

20   data entry into the Green memory 29b. Graphics pixels and image pixels for the

21   second series of the image group are entered into the memory 29b . . . At this

22   point, display containers with images would be presented on the monitor 26 and

23   on the monitor 27 . . . ('416 patent; col. 10, ln. 3 – col. 11, ln. 6) (Exhibit A)

24   (emphasis added).

25   The following statement further establishes that the application process, which performs

26   the ordering function, is "a DOS-based personal computer or workstation which has the

27   capability to concurrently execute an application process and a plurality of interface processes, in

28   which the application process is written in the well-known C language" – the system includes a

DOS-based personal computer or workstation 10 which has the capability to concurrently execute an application process 12 and a plurality of interface processes 14. The application process which, preferably, is written in the well known C language, embodies process and functions of the invention as described later in further detail" ('416 patent; col. 4, lns. 60-67) (Exhibit A). And, as discussed above, because the disclosed structure for the application process is a special purpose computer, a specific algorithm is not needed.

      **D.**        **CLAIM 3 OF THE '416 PATENT**

          **1.**        **"means for synchronizing the presentation of each image series of two or more image series such that whenever the display of one image series of the two or more image series is changed to display a next image in the order of its respective sequence, each other image series of the two or more image series is correspondingly changed"**

     The parties agree that this element is written in means-plus-function form. As such, patent law requires first identifying the function and second identifying the structure disclosed for performing that function. The parties agree that the function is "synchronizing the presentation of each image series of two or more image series such that whenever the display of one image series of the two or more image series is changed to display a next image in the order of its respective sequence, each other image series of the two or more image series is correspondingly changed." The disagreement is over the structure. DR Systems asserts that the disclosed structure is "a DOS-based personal computer or workstation which has the capability to concurrently execute an application process and a plurality of interface processes, in which the application process is written in the well-known C language." The structure is the same as that identified for the "means for ordering" because synchronization is described as a result of presenting images of two image series in a specific order:

     An important feature of the invention termed "coupling" is employed to synchronize the presentation of the axial T1 and T2 series so that whenever an image of one series is changed to the next image in the series, the other series is changed identically to display the image of the other series occupying the same

sequence position. Thus, if presentation area 1 in the display container of FIG. 4 displays image 1 of the axial T1 series and then riffles through the images of the series, the display in presentation area 2 would identically riffle through the images of the axial T2 series, beginning with image 1. The invention contemplates that the coupling feature of the series mode of presentation will synchronize image presentation only between co-relative image series. Thus, for example, an axial T1 series would be coupled for a presentation with an axial T2 series, but not with a sagittal T1 series such as that shown in presentation area 4 of the display container in FIG. 4 ('416 patent; col. 7, ln. 52 – col. 8, ln. 2) (Exhibit A).

In the series presentation mode, **the application process maintains a monitor control block for each of the monitors 26, 27, and 28**. The monitor control blocks are, respectively, 120, 121, and 122. Assume that the series presentation display containers such as the display container illustrated in FIG. 4 are presented on the monitors 26 and 27. For each monitor, the control block must list the principal objects which, for the display container of FIG. 4, are the four presentation areas of the control panel and the icon control panel. The control block links a respective series with each of the presentation areas in the IMAGES column of the block. In the COUPLING column, a related image series is listed if the coupling function has been invoked ('416; col. 14, lns. 24-37) (Exhibit A) (emphasis added).

Thus, synchronization is simply a further limitation on the order of presentation applied to the images, and as such, its structure is the same as that identified for ordering images.  Again, for the same reason identified above, the disclosed structure for the application process is the disclosed special purpose computer and a specific algorithm is not needed.

E.   **CLAIM 5 OF THE '416 PATENT**

1.   **"means for displaying a palette display container on the one or more display monitors"**

DR Systems asserts that this element is not a means-plus-function element.  Because the word "means" is used in this element, Federal Circuit law presumes that it is a means-plus-function element.  But, Federal Circuit precedent also holds that this presumption is overcome when the claim discloses sufficient structure to perform the recited function.  In this case, the presumption is overcome because the recited "one or more display monitors" provides sufficient structure to perform the identified function of displaying a palette display container.  Evidence that a monitor is sufficient structure for the display function is the same as that identified in the above No. 2 for Claim 1.

2.   **"means for selecting an image of an image series displayed in the at least one display container and reproducing the selected image"**

The parties agree that this element is written in means-plus-function form.  As such, patent law requires first identifying the function and second identifying the structure disclosed for performing that function.  The parties agree that the function is "for selecting an image of an image series displayed in the at least one display container and reproducing the selected image."  The disagreement is over the structure.  DR Systems asserts that the disclosed structure is "(1) a DOS-based personal computer or workstation which has the capability to concurrently execute an application process and a plurality of interface processes, in which the application process is written in the well-known C language, (2) an image subsystem, (3) a low level controller, (4) a trackball mechanism, keyboard; (5) screen driver and (6) user interface."  This structure is associated with the ordering of the display function by the following disclosure:

> Refer now to FIGS. 3, 8, and 9 for an understanding of a monitor presentation format procedure according to the invention. Once the displays in the monitors 26, 27, and 28 have been initialized for monitor presentation as described above, the monitor format procedure begins. This procedure executes in response to **cursor location and trackball button activation** . . . In decision 93,

**the application process** determines whether a working palette grid location has been selected for placement of an image. In this regard, the **application process** maintains a working palette grid pointer which is updated to the next working palette grid location when an image is moved to the current one. The grid pointer can also be forced to a grid location by moving the cursor from the monitor where it is currently located to the monitor where the working palette is displayed and pointing and clicking a grid location in the working palette display container. Preferably, a working palette grid location is selected by clicking the left button of the **trackball mechanism**. (Once an image has been moved to a preselected working palette grid location, the grid pointer is reset to indicate the next empty grid location which was available before user selection.) The cursor is then returned to a monitor which shows an image series. Decision 94 assumes that the cursor is in a presentation area of the monitor mode display container. If the right button of the **trackball mechanism** is clicked, the **application process** infers that the user wants the image in the presentation area moved to the working palette grid location indicated by the palette grid pointer. In this case, the image at the cursor location and any annotation graphics which it contains are copied in step 94a into the working palette grid at the location indicated by the working palette grid pointer. Refer to FIG. 9 for an understanding of how the **application process** accomplishes this step ('416 patent; col. 12, lns. 9-60) (Exhibit A) (emphasis added).

In FIG. 9, three monitor control blocks 100, 102, and 103 are illustrated. The **application process** maintains the control blocks, each of which completely describes in object form the current display on a particular monitor. For example, the monitor control block 100 lists the identification and location of each graphical object displayed on the monitor 26. This would include a complete object description of a monitor mode display container, a control panel, if a monitor is active, and the images of the series presented in the display container.

1   For example, consider the first image of an axial T1 series which is listed in grid
2   location 1, corresponding to the upper left-hand presentation area in the display
3   container of FIG. 3. The monitor control block 100 also lists the graphics
4   displayed at the grid location. When an image is to be moved to the working
5   palette it is copied from the object indexed by the current cursor location in the
6   control block of the monitor where the cursor is located to the palette monitor
7   control block at the grid location indicated by the working palette grid pointer
8   104. In order to effect the update on the working palette display container
9   presented on the palette monitor 28, the application process, using the palette
10  monitor control block, updates the object list to describe the updated working
11  palette display container . . . In response to the SELECT MONITOR control
12  signal, the **image subsystem** accesses the working memory to obtain the pixels
13  for the image to be moved and enters them into the Blue memory 29c . . . [t]his
14  causes the selected image and accompanying graphics to be added to the working
15  palette presented on the monitor 28 ('416 patent; col. 12, ln. 61 – col. 13, ln. 28)
16  (Exhibit A) (emphasis added).

17      As indicated above, the reference to the application process is an identity of the a DOS-
18  based personal computer or workstation which has the capability to concurrently execute an
19  application process and a plurality of interface processes, in which the application process is
20  written in the well-known C language (see No. 15 of Claim 1).  Also, as described in more detail
21  above, the control of the output of images is provided by the application process, low level video
22  controller, and video card (see No. 17 of Claim 1).  Finally, the structure identified for allowing
23  the system to receive inputs (again as described in more detail above) is a keyboard and trackball
24  mechanism, screen driver and user interface (see No. 13 of Claim 1).  Therefore, in light of the
25  above cited portion of the specification, the structure identified by DR Systems is a complete list
26  of all the structures necessary for this function.

27
28

1       **F.**    **CLAIM 6 OF THE '416 PATENT**

2           **1.**    **"means connected to the storage subsystem and to the at least one**

3                   **display container for retrieving images from the image database and**

4                   **displaying retrieved images in the at least one display container"**

5         The parties agree that this element is written in means-plus-function form.  As such,

6   patent law requires first identifying the function and second identifying the structure disclosed

7   for performing that function.  Before defining the function of this element, it is helpful to first

8   break this element into its two distinct parts; namely, its structural and functional parts.  First,

9   this element begins by stating that the "means" is connected to (1) to the storage subsystem for

10  storing an image database and (2) to the at least one display container (i.e., the display monitor).

11  Next, the element describes the function and purpose of this "means."  Specifically, the "means"

12  (1) controls the retrieval of an image series from an image group in the "storage subsystem" and

13  (2) controls the output to the at least one display container on the display monitor.  Notably, the

14  context of this element establishes that the function of this "means" is not (1) to actually retrieve

15  an image series, or (2) actually display images.  Each of those functions and corresponding

16  structures are previously identified in Claim 6.

17        Instead, this "means" is an application process, which is written in the well-known C

18  language, on the DOS-based personal computer that controls the retrieval of images and the

19  outputted images to a display.  To represent this, DR Systems has proposed the following

20  definition for its function "to process information to recover images from the storage subsystem

21  and to output those images to a display container on a monitor."  This identified function is

22  consistent with the ordinary language of the claims, which identifies a means "for <u>retrieving</u>

23  images from the image database and <u>displaying retrieved images</u> in the at least one display

24  container."

25        The description of the structure identified to perform this function provides further

26  support for DR Systems' construction for the function, as well as identifying the appropriate

27  structure.  The structure identified for performing this function is (1) an image subsystem, (2) a

28  DOS-based personal computer or workstation which has the capability to concurrently execute

an application process and a plurality of interface processes, in which the application process is written in the well-known C language, (3) a video card, and (4) a low level controller.  Support for this structure is the same identified in Nos. 15 and 17 for Claim 1 above.

### 2.    "data table"

DR Systems' proposed construction for "data table" is "an arrangement of information in the form suitable for ready reference."  The ordinary meaning of the terms "data" and "table" demonstrate that this phrase relates to an arrangement of information in a from suitable for ready reference. "Data" is a "re-interpretable representation of information in a formalized manner suitable for communication, interpretation, or processing" and a "table" is an "array of data each item of which can be unambiguously identified by means of one or more arguments." IBM Dictionary of Computing, Ninth Edition (1991), pp. 137, 569 (Exhibit D).  Moreover, the intrinsic record does not provide specific definition for this term; nor are there any limiting statements.  As such, the plain meaning should control.

### 3.    "referring physician"

DR Systems proposed construction for this term is "a physician who requests a medical image examination."  This definition is simply the plain meaning and consistent with how a person of ordinary skill understands the term.  The ordinary meaning of "refer" is "to send or direct for treatment, aid, information or decision." Webster's Ninth New Collegiate Dictionary, 9th Ed. (1988), p. 989 (Exhibit E).  In the context of the '416 patent, the referring physician is the doctor who requests or sends a patient to a radiologist for a decision regarding the patient's medical image examination.  Evidence that a person of skill understands "referring physician" as a physician who requests a medical image examination is provided by the Examiner's remarks.  Specifically, the Examiner remarks that "The Yamada et al. database further includes an identification of an exam requesting doctor (fig 9), as in [then] claim 12's 'referring physician' (also [then] claim 17)" ('416 File History; p. DR000171) (Exhibit B).

### 4.    "output preferences"

DR Systems' proposed construction for this term is "information specifying a choice for how a particular referring physician wants to receive images from a diagnosing physician."  The

1  ordinary meaning of these two words, their context in the claim and the specification are

2  supportive of this position.   "Output" is a broad term that generally means "pertaining to a

3  device, process, or channel involved in an output process, or to the associated data or states"

4  IBM Dictionary of Computing, Ninth Edition (1991), p. 406, 244 (Exhibit D).   The context in

5  which this phrase appears clarifies that this output relates to a device, process, or channel

6  involved in an output process for a referring physician: "first data table . . . including respective

7  fields specifying output preferences of the identified referring physician for outputting to the

8  identified referring physician images from the display."   The ordinary meaning and the context

9  of the claims show, therefore, that "output preference" is information in a data table describing

10  how (i.e., the device, process, or channel involved in an output process) the referring physician

11  wants to receive images from the display of the diagnosing physician.   The specification is

12  consistent with this interpretation.

13        Specifically, the specification states:

14        As FIG. 6 illustrates, the PATIENT.dB file includes a REFERRING PHYSICIAN

15  column containing values which index to entries in a REF.DOCS file 52. The

16  REF.DOCS file 52 lists referring physicians. Each referring physician entry

17  **includes a set of functions specified by the identified referring physician**

18  which are to be executed when a radiologist indicates that examination of an

19  image group is completed by pressing a DONE button, which is explained later in

20  more detail. . . . In decision 96, if a DONE button is selected, the application

21  program executes the DONE functions for the referring physician. These **may**

22  **include, for example,** simply printing out a hard copy of the working palette

23  display container and entering the printout into the patient's file, faxing a data or

24  an image copy of the working palette display container to a predetermined

25  location, or transmitting a data representation of the working palette monitor

26  through a modem to a predetermined location.

27

28

1  ('416 patent; col. 9, lns. 12-20, col. 13; lns. 41-50) (Exhibit A) (emphasis added).  Tellingly, the

2  specification speaks in broad, non-limiting terms; leaving open a wide range of options for

3  defining how the referring physician wants to receive images viewed by a diagnosing radiologist.

4        **5.**    **"mode preferences"**

5        DR Systems' proposed construction for this term is "information that specifies a

6  particular diagnosing physician's choice of rules for controlling the organization applied to all

7  the images in an image group that are output to a monitor; for example, monitor or series mode."

8  The Background of the Invention describes one of the principle problems with the prior art

9  systems as doing "little to adapt these systems to the special needs of radiologists who must

10  consider and manipulate many images in particular ways for special purposes" ('416 patent; col.

11  1, lns. 55-58) (Exhibit A).  The present invention focuses on the realization that "each radiologist

12  has a highly personal mode of examination. For example, one radiologist may wish to examine a

13  first sequence of transparencies in its entirety and then a second, related sequence before trying

14  to correlate between individual images of the sequences. Another radiologist may wish to

15  examine sequences in parallel by simultaneously considering images taken of the same

16  anatomical plane under different conditions of exposure" ('416 patent; col. 1, lns. 58-56)

17  (Exhibit A).  The systems existing at the time of the invention failed to adapt for the storage and

18  presentation of radiological images to automate the presentation modalities of image series ('416

19  patent; col. 1, ln. 66 – col. 2, ln. 1) (Exhibit A).  Therefore, "a primary objective of this invention

20  [is] to provide an automated system for storage, retrieval, and presentation of medical images

21  which is especially adapted for the presentation of medical image sequences and which affords

22  the user with [] flexible . . . functions that permit direct manipulation of the modes of image

23  presentation" ('416 patent; col. 2, lns. 16-23) (Exhibit A).

24        To accomplish this primary objective, "[t]he invention includes at least two modes for

25  presenting medical image series" ('416 patent; col. 6, lns. 57-60) (Exhibit A).  The specification

26  then describes two exemplary preferred modes for presenting medical images.   First, the

27  specification describes the "monitor" mode of image presentation.   Second, the specification

28  describes the "series" mode of presentation.  The "monitor" mode of presentation is illustrated in

FIG. 3 and describes one rule for controlling the organization applied to all the images in an image group. That rule requires displaying each medical image in an image series to be placed sequentially in multiple presentation areas that fill a display container ('416 patent; col. 6, ln. 61 – col. 7, ln. 15) (Exhibit A). The "series" mode of presentation is illustrate in FIG. 4 and describes another rule for controlling the organization applied to all the images in an image group. This rule requires each image series to be presented one image at a time in the order of its respective sequence within a single presentation area ('416 patent; col. 7, lns. 34-50).

Put in non-technical terms, "monitor" mode treats the exam images like a deck of playing cards in which each suit (Hearts, Spades, Diamonds and Clubs) is an image series of the image group. In the "monitor" mode, each card (image) for a particular suit is laid out one card next to the other in a single display contain. Each card (image) is in its own presentation area in the display container. For example, the first display container displays Ace through King of Hearts, the second display container displays Ace through King of Spades, and so on.

"Series" mode keeps the deck of playing cards (image group) stacked so that all the cards (images) for all the suits (image series) are displayed one card at a time in a single presentation area of the display container. The display container in this mode, however, can have multiple presentation areas in which each has a different deck (image group) being presented.

Each of these examples represents a particular rule for controlling the organization applied to all the images in an image group – i.e., mode. Remembering that the invented system is disclosed (1) to address each radiologist's highly personal mode of examination and that (2) the primary objective of the invention is to provide an automated system especially adapted to provide the radiologist with functions that permit direct manipulation of the modes of image presentation, the invention contemplates a large collection of rules (modes) that are used to control the organization applied to all the images in an image group to suit a radiologist's preferred method of organizing images for examination. As such, "mode preference" should not be limited to the two exemplary rules used to control organization. To account for this teaching, "mode preference" is properly construed to mean "information that specifies a particular

diagnosing physician's choice of rules for controlling the organization applied to all the images in an image group that are output to a monitor; for example, monitor or series mode."

### 6. "outputting images"

DR Systems asserts that this term does not need construing, but, to the extent it is construed, DR Systems' proposed construction for this term is "providing a visual representation of images from an image series according to the referring physician's particular choice of output preferences."   This construction is support by the context in which it is found in the claim: "outputting images from the at least one image series according to output preferences of a referring physician identified by a referring physician identifier . . ." ('416 patent; col. 20, lns. 28-31) (Exhibit A).  Likewise, it is consistent with the ordinary meaning of the words and the specification (see No. 4 of Claim 6).   The difference between the use of "output" here and its use in "output preference" above, is that this element relates to performing the step of actually providing images according to the information prescribed by the referring physician's output preference.  Therefore, in this step of the method, the referring physician is receiving visual representations of the images examined by the diagnosing physician.

### G.    CLAIM 11 OF THE '416 PATENT

### 1.    "monitor means for presenting graphical images"

DR Systems asserts that this element is not a means-plus-function element.  Because the word "means" is used in this element, Federal Circuit law presumes that it is a means-plus-function element.  But, Federal Circuit precedent also holds that this presumption is overcome when the claim discloses sufficient structure to perform the recited function.  In this case, the presumption is overcome because the recited "monitor" provides sufficient structure to perform the identified "presenting" function.  Evidence that a monitor is sufficient structure for the presenting function is the same as that identified in the above No. 2 for Claim 1.

### 2.    "means for displaying a first display container and a second display container on the monitor means"

Likewise, DR Systems asserts that this element is not a means-plus-function element. And again, the presumption is overcome because the recited "monitor" provides sufficient

structure to perform the identified "displaying" function.  Evidence that a monitor is sufficient structure for the presenting function is the same as that identified in the above No. 2 for Claim 1.

   **3.**  **"application means connected to the monitor means, to the at least one data storage device and to the means for displaying the first and second display containers and responsive to a user-selected group identification and a diagnosing physician identifier for displaying at least two image series of an image group indexed by the user-selected group identification, said application means further for:**

    **formatting each image series for display on the monitor means in accordance with format preferences specified in fields of the diagnosing physician identifier;**

    **displaying each image series on the monitor means in the order of its respective sequence in a respective display container such that each presentation area of the respective display container includes no more than one image; and**

    **outputting images from said at least two image series according to output preferences of a referring physician identified by a referring physician identifier indexed from the user-specified group identification application means"**

  The parties agree that this element is written in means-plus-function form.  As such, patent law requires first identifying the function and second identifying the structure disclosed for performing that function.  Before defining the function of this element, it is helpful to first break this element into its two distinct parts; namely, its structural and functional parts.  First, this element begins by stating that the "application means" is connected (1) to the monitor means, (2) to the at least one data storage device, and (3) to the means for displaying the first and second display containers.  Next, the element describes the function and purpose of this "application means."  Specifically, the "application means" takes specific actions in response to the selected group identification and diagnosing physician identifier to (1) control the display of

the at least two image series of an image group identified by the group indentification stored in the "at least one data storage device," (2) to control the display format of an image series in the number and arrangement of presentation areas (i.e., the number of rows and columns of presentation areas in the display container; for example a 2X2 or 4X4 matrix) prespecified by the diagnosing physician's format preferences, (3) to control the output of an image series so that the order of its respective sequence in a respective display container on the monitor allows each presentation area of the respective display container to include no more than one image (i.e., monitor mode), and (4) to control outputting images to a referring physician in accordance with that physician's preference.  Notably, the context of this element establishes that the function of this "application means" is not displaying any images or actually retrieving.  Accordingly, DR Systems proposed construction for this "application means" is "(1) to process the information derived from the diagnosing physician identifier and the group identification to recover at least two image series for outputting to a monitor in a format specified in the particular diagnosing physician's format preferences and controlling the output of image series so that each image series is displayed on a monitor in the order of its respective sequence in a respective display container such that each presentation area of the respective display container includes no more than one image and (2) to process the information derived from the referring physician identifier for outputting images in a manner identified by that physician's output preferences.

The descriptions of the structure identified to perform these functions provide further support for DR Systems' construction of the functions, as well as identifying the appropriate structure.  The structure identified for performing this function is (1) an image subsystem, (2) a DOS-based personal computer or workstation which has the capability to concurrently execute an application process and a plurality of interface processes, in which the application process is written in the well-known C language, (3) a video card, and (4) a low level controller.  To avoid repetition, support for this structure is the same identified in Nos. 15 and 17 for Claim 1 and No. 1 of Claim 2, above.

Furthermore, the specification associates the DOS-based personal computer structure with the function of outputting images according to the output preferences of the referring

physician.  Specifically, the specification states: "In decision 96, if a DONE button is selected, **the application program executes the DONE functions for the referring physician**.  These may include, for example, simply printing out a hard copy of the working palette display container and entering the printout into the patient's file, faxing a data or an image copy of the working palette display container to a predetermined location, or transmitting a data representation of the working palette monitor through a modem to a predetermined location" ('416 patent; col. 13, lns. 41-50) (Exhibit A) (emphasis added).  Therefore, the above identified structure is complete and is all that is necessary to perform the recited functions.

**H.    CLAIM 14 OF THE '416 PATENT**

1.    **"application means connected to the monitor means, to the at least one data storage device and to the means for displaying at least one display container and responsive to a user-selected group identification and a diagnosing physician identifier for displaying at least two image series of an image group indexed by the user-selected group identification, said application means further for:**

**formatting each image series for display on the monitor means in accordance with format preferences specified in fields of the diagnosing physician identifier;**

**displaying each image series on the monitor means one image at a time in the order of its respective sequence in a respective presentation area; and**

**outputting images from said image group according to output preferences of a referring physician identified by a referring physician identifier indexed from the user-specified group identification"**

Because this element is essentially the same as element described in No. 3 of Claim 11, except that the order for displaying an image series is different, DR Systems relies in large part on the analysis provided in that section.  The ordering is different because each image series is

displayed in sequence in a single presentation area (i.e., series mode); whereas in Claim 11 each image of an image series is displayed in a different presentation area in a single display container.  Accordingly, DR Systems proposed construction for this "application means" is "(1) to process the information derived from the diagnosing physician identifier and the group identification to recover at least two image series for outputting to a monitor in a format specified in the particular diagnosing physician's format preferences and controlling the output of image series so that each image series is displayed on a monitor one image at a time in the order of its respective sequence in a respective presentation area and (2) to process the information derived from the referring physician identifier for outputting images in a manner identified by that physician's output preferences.  The structure is the same as that for No. 3 of Claim 11 and for the same reasons.

## IV.     CONCLUSION

For the forgoing reasons, this Court should adopt DR Systems' proposed constructions of the disputed terms and phrases.


                                        Respectfully submitted,

Dated:January 18, 2007                  DR Systems, Inc.


                           By:    /s/Frederick C. Laney
                                  Raymond P. Niro (*Pro Hac Vice*)
                                  Raymond P. Niro, Jr. *(Pro Hac Vice)*
                                  Matthew G. McAndrews (*Pro Hac Vice*)
                                  Dina M. Hayes (*Pro Hac Vice*)
                                  Frederick C. Laney (*Pro Hac Vice*)
                                  NIRO, SCAVONE, HALLER & NIRO
                                  181 West Madison Street, Suite 4600
                                  Chicago, Illinois  60602
                                  Telephone:    (312) 236-0733
                                  Facsimile:    (312) 236-3137

                                  J. Christopher Jaczko (149317)
                                  Allison H. Goddard (211098)
                                  JACZKO GODDARD LLP
                                  4401 Eastgate Mall
                                  San Diego, California  92121
                                  Telephone:  (858) 550-6150
                                  Facsimile:  (858) 225-3500

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing **DR SYSTEMS' OPENING BRIEF SUPPORTING ITS CLAIM CONSTRUCTIONS FOR THE '416 PATENT** was served on the following via electronic transmission via the Court's ECF filing system this 17th_day of January, 2007 and Federal Express on January 18, 2007: ___

Robert C. Scheinfeld, Esq.
Jeffrey D. Sullivan, Esq.
Robert Maier, Esq.
BAKER BOTTS LLP
30 Rockefeller Plaza
New York, New York  10112-4498
Phone: 212.408.2589 Fax: 212.259.2589

robert.scheinfeld@bakerbotts.com
jeffrey.sullivan@bakerbotts.com
robert.maier@bakerbotts.com

*Attorneys for Defendant*
Fujifilm Medical Systems USA, Inc.


Scott R. Mosko, Esq.
FINNEGAN, HENDERSON, FARABOW, ET AL.
3300 Hillview Avenue
Palo Alto, California  94304-1203
Tel:     (650) 849-6672
Fax:     (650) 849-6666
scott.mosko@finnegan.com

*Attorneys for Defendant*
Philips Electronics North America
    Corporation


Stephen M. Hankins, Esq.
W. Paul Schuck, Esq.
SCHIFF HARDIN LLP
One Market, Spear Street Tower
32nd Floor
San Francisco, California  94105
Tel:     (415) 901-8700
Fax:     (415) 901-8701
smh@mjllp.com
wps@mjllp.com

*Attorneys for Defendant*
Eastman Kodak Company

Victoria Maroulis, Esq.
David T. Pollock, Esq.
QUINN EMANUEL
555 Twin Dolphin Drive, Suite 560
Redwood Shores, California  94065
Tel:     (650) 801-5000
Fax:     (650) 801-5100
victoriamaroulis@quinnemanuel.com
davidpollock@quinnemanuel.com

*Attorneys for Defendants*
GE Healthcare Ltd. and GE Medical
    Systems, Inc.


Laurence S. Shtasel, Esq.
BLANK ROME LLP
One Logan Square
18th & Cherry Streets
Philadelphia, Pennsylvania  19103
Tel:     (215) 569-5500
Fax:     (215) 569-5555
shtasel@blankrome.com

*Attorneys for Defendant*
Dynamic Imaging, LLC


John D. Hamann
Nagendra Setty
Rasheed M. McWilliams
FISH & RICHARDSON
1180 Peachtree Street, N.E.
 21st Floor
Atlanta, GA 30309
Tel: (404) 892-5005
Fax: (404) 892-5002
hamann@fr.com
nsetty@fr.com

*Attorneys for Defendant*
McKesson Corporation

-42-          Case No. 05cv0935 B (AJB)

1

2   John P. Bovich, Esq.                         H. Michael Hartmann
    Scott D. Baker                              Robert T. Wittmann
3   REED SMITH LLP                              Wesley O. Mueller
    Two Embarcadero Center, Suite 2000          LEYDIG, VOIT & MAYER, LTD.
4   San Francisco, California  94111            Two Prudential Plaza, Suite 4900
    jbovich@reedsmith.com                       180 North Stetson Avenue
5                                               Chicago, Illinois  60601
    *Attorneys for Defendants*                  Tel:  (312) 616-5600
6   Siemens Medical Solutions USA, Inc.,        Fax:  (312) 616-5700
        Siemens Corporation, and Siemens AG     mhartmann@leydig.com
7                                               wmueller@leydig.com
                                                bwittmann@leydig.com
8
                                                *Attorneys for Defendants*
9                                               Agfa-Gevaert N.V. and Agfa Corporation

10

11

12

13                          /s/Frederick C. Laney

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28