1   QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
    Victoria F. Maroulis (CA Bar No. 202603)
2   555 Twin Dolphin Drive, Suite 560
    Redwood Shores, California 94065-2139
3   Telephone: (650) 801-5000
    Facsimile: (650) 801-5100
4   victoriamaroulis@quinnemanuel.com

5   Counsel for all Defendants listed at the end of the document

6

7

8                   **UNITED STATES DISTRICT COURT**

9             **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

10

11  DR SYSTEMS, INC., a California          )   Case No. 06 cv 0417 B (NLS)
    corporation,                            )
12                                          )
                                            )
13              Plaintiff,                  )
                                            )
14  v.                                      )
                                            )
15  FUJIFILM MEDICAL SYSTEMS USA,           )
    INC,; GE HEALTHCARE LTD, GE             )
16  MEDICAL SYSTEMS, INC.,                  )
    KONINKLIJKE PHILIPS                     )
17  ELECTRONICS N.V., PHILIPS               )   **DEFENDANTS' CORRECTED**
    ELECTRONICS NORTH AMERICA               )   **OPENING CLAIM CONSTRUCTION**
18  CORPORATION, MCKESSON                   )   **BRIEF REGARDING U.S. PATENT**
    INFORMATION SOLUTIONS LLC,              )   **NO. 5,452,416**
19  AGFA-GEVAERT N.V., AGFA                 )
    CORPORATION, DYNAMIC                    )
20  IMAGING, LLC, SIEMENS MEDICAL           )
    SOLUTIONS USA, INC., SIEMENS            )
21  CORPORATION, SIEMENS AG AND             )
    EASTMAN KODAK COMPANY,                  )
22                                          )
                Defendants.                 )
23  _____     )
    AND RELATED CROSS ACTIONS.              )
24

25

26

27

28

# TABLE OF CONTENTS

I.    INTRODUCTION ............................................................................................................ 2

II.   BACKGROUND ............................................................................................................. 3

   A.  Introduction to PACS Technology ....................................................................... 3

   B.  Summary of the Patent-in-Suit ............................................................................. 4

III.  DEFENDANTS' PROPOSED CLAIM CONSTRUCTIONS ......................................... 5

   A.  Overview of Legal Standards and Their Application............................................. 5

   B.  Overview of Disputed Terms ................................................................................ 6

   C.  Physicians Terms.................................................................................................... 7

   D.  Display Terms ........................................................................................................ 8

      1.   "System for Presenting Images"/"Computer Display System".................. 9

      2.   "Display format"/"Displaying format" .................................................... 10

      3.   "Mode Preferences" ................................................................................. 11

   E.  Output Terms........................................................................................................ 13

      1.   "Output Functions" ................................................................................. 14

      2.   "Output Preferences"............................................................................... 16

      3.   "Providing an Output from the System"/ "Outputting Images"............... 17

   F.  Database Terms .................................................................................................... 18

      1.   "Data Table" / "Table Data Structure"..................................................... 18

      2.   "Physician Data Tables"........................................................................... 20

      3.   "Index"...................................................................................................... 21

      4.   "Physician Identifier" ............................................................................... 22

      5.   "Image Database".................................................................................... 23

   G.  File-Naming Rule Terms...................................................................................... 24

      1.   "Images Being Separated Into (a Plurality of) Image Groups"................ 26

      2.   "Each Image Series Being Ordered…"..................................................... 27

20180/2040416.1

3.    "Unique Group Identification".................................................................. 28

H.  Retrieving at Least One Image Series of an Image Group........................................... 29

I.   Means-Plus-Function Terms ...................................................................................... 30

1.    Overview of Legal Standards and Their Application................................ 30

(a)    Legal Standards and Their Application by Defendants          30

(b)    DR's Constructions Violate the Controlling Legal Standards          31

2.    "Means For Storing an Image Database Including a Plurality of Images of Anatomical Structures, the Images Being Separated Into a Plurality of Image Groups" (Claim 1) ...................................................... 32

3.    "Application Means..." (Claims 11, 14)................................................... 35

4.    "Means...For Retrieving at Least One Image Series of an Image Group Indexed by the Group Identification and for Displaying the at Least One Image Series in One or More Presentation Areas of the Plurality of Presentation Areas in a Display Format Contained in the Physician Data Tables" (Claim 1) .............................................................. 37

5.    "Means for Providing an Output from the System According to an Output Function Specified In the Physician Data Tables" (Claim 1) ....... 38

6.    "Means For Ordering the Display...", "Means For Synchronizing...", "Means for Selecting an Image..." (Claims 2, 3, 5)................................................................................................................ 40

7.    "Means...For Retrieving Images from the Image Database and Displaying Retrieved Images in the at Least One Display Container" (Claim 6) ................................................................................................... 40

IV.    CONCLUSION .......................................................................................................... 41

1

## **TABLE OF AUTHORITIES**

2

3
<u>Cases</u>

4
*Abbott Labs. v. Syntron Bioresearch, Inc.*,
 334 F.3d 1343 (Fed. Cir. 2003) ..................................................................... 5

5

*Alloc, Inc. v. U.S. Int.'l Trade Comm'n*,
6
 342 F.3d 1361 (Fed. Cir. 2003) ................................................................... 26

7
*Astrazeneca AB v. Mutual Pharm. Co.*,
 384 F.3d 1333 (Fed. Cir. 2004) ................................................................... 25

8

9
*Asyst Tech., Inc. v. Empak, Inc.*,
 268 F.3d 1364 (Fed. Cir. 2001) ................................................................... 30

10
*Atmel Corp. v. Information Storage Devices, Inc.*,
 198 F.3d 1374 (Fed. Cir. 1999) ................................................................... 34

11

12
*Bancorp Servs., L.L.C. v. Hartford Life Ins. Co.*,
 359 F.3d 1367 (Fed. Cir. 2004) ............................................................. 14, 17

13
*Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*,
 296 F.3d 1106 (Fed. Cir. 2002) .......................................................... 31, 32, 33

14

15
*Cultor Corp. v. A.E. Staley Mfg. Co.*,
 224 F.3d 1328 (Fed. Cir. 2000) ................................................................... 27

16
*Default Proof Credit Card System, Inc. v. Home Depot U.S.A., Inc.*,
 412 F.3d 1291 (Fed. Cir. 2005) ................................................................... 30

17

18
*Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*,
 93 F.3d 1572 (Fed. Cir. 1996) ..................................................................... 14

19
*Genzyme Corp. v. Transkaryotic Therapies, Inc.*,
 346 F.3d 1094 (Fed. Cir. 2003) ..................................................................... 6

20

21
*Harris Corp. v. Ericsson Inc.*,
 417 F.3d 1241 (Fed. Cir. 2005) ........................................................... passim

22
*Honeywell Int'l, Inc. v. ITT Indus., Inc.*,
 452 F.3d 1312 (Fed. Cir. 2006) ............................................................. 25, 26

23

24
*In re Lowry*,
 32 F.3d 1579 (Fed. Cir. 1994) ..................................................................... 34

25
*Inpro II Licensing, S.A.R.L v. T-Mobile USA, Inc.*,
 450 F.3d 1350 (Fed. Cir. 2006) ......................................................... 26, 28, 30

26

27
*Lockheed Martin Corp. v. Space Systems/Loral, Inc.*,
 324 F.3d 1308 (Fed. Cir. 2003) ...................................................... 30, 31, 33, 35

28

*Medical Instrumentation and Diagnostics Corp. v. Elekta AB,*
    344 F.3d 1205 (Fed. Cir. 2003) ...................................................... 2, 31, 32

*Merck & Co., Inc. v. Teva Pharmaceuticals USA, Inc.,*
    347 F.3d 1367 (Fed. Cir. 2003) .................................................................. 11

*Modine Mfg. Co. v. U.S. Int'l Trade Comm'n,*
    75 F. 3d 1545 (Fed. Cir. 1996) ................................................................... 29

*Network Commerce, Inc. v. Microsoft Corp.,*
    422 F.3d 1353 (Fed. Cir. 2005) .................................................................. 14

*Omega Engineering, Inc. v. Raytek Corporation,*
    334 F.3d 1314 (Fed. Cir. 2003) .................................................................. 30

*On Demand Machine Corp. v. Ingram Indus., Inc.,*
    442 F.3d 1331 (Fed. Cir. 2006) ............................................................. 6, 12

*Phillips v. AWH Corp.,*
    415 F.3d 1303 (Fed. Cir. 2005) ......................................................... passim

*Scimed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.,*
    242 F.3d 1337 (Fed. Cir. 2001) .................................................................. 12

*SmithKline Beecham Corp. v. Apotex Corp.,*
    403 F.3d 1331 (Fed. Cir. 2005) ................................................................... 9

*Toro Co. v. White Consolidated Indus., Inc.,*
    199 F.3d 1295 (Fed. Cir. 1999) ............................................................ 26, 30

*Vitronics Corp. v. Conceptronic, Inc.,*
    90 F.3d 1576 (Fed. Cir. 1996) ..................................................................... 6

*Wang Labs. Inc. v. America Online, Inc.,,*
    197 F.3d 1377 (Fed. Cir. 1999) .................................................................. 12

*Watts v. XL Systems, Inc.,*
    232 F.3d 877 (Fed. Cir. 2000) .................................................................... 27

*WMS Gaming, Inc. v. Int'l Game Technology,*
    184 F.3d 1339 (Fed. Cir. 1999) ......................................................... passim

<u>Statutes</u>

35 U.S.C. § 112 ................................................................................... passim

20180/2040416.1

## I.     INTRODUCTION

In this case, Plaintiff DR Systems, Inc. ("DR") alleges that the Defendants' Picture Archiving and Communication Systems ("PACS") products infringe U.S. Patent No. 5,452,416 (the "'416 patent"). PACS are medical imaging systems used by physicians and hospitals to manage large volumes of digital medical images, collected from examination instruments such as CT, MRI, or X-ray (the modalities that generate the images).

DR did not invent PACS. Nor did DR invent the CT, MRI, or X-ray modalities. DR also did not invent the computerized management of medical images or displaying such images to radiologists for diagnosis. All of these technologies were widely-known and commercialized well before the December 1992 application for the '416 patent.

In other words, after the PACS field was already well-developed, DR patented what it perceived to be enhancements to prior art PACS. The '416 patent describes and claims a highly specific system for organizing, storing, and displaying the images and then outputting them to referring physicians who have sought radiological consultation for diagnostic purposes. Specifically, the '416 patent claims a system that: (1) displays medical images according to the preferences of the diagnosing physician and (2) outputs images from the system according to the preferences of the referring physician. The '416 patent also requires naming the medical image files so that they can be grouped and ordered by using the file name (the "file-naming rule"). In order to implement these features, the '416 patent requires, *inter alia*, a specific database structure, including data tables for diagnosing and referring physicians.

DR received narrow claims commensurate in scope with those modest advancements. Now, more than a decade after the '416 patent issued, DR seeks to stretch the '416 patent far beyond its true scope to tax the entire PACS industry.

DR seeks to divorce claim construction from the intrinsic record, apparently in favor of highly suspect and malleable extrinsic "evidence." In contrast, Defendants rely on the claim language, the '416 patent specification and the prosecution history, as the Federal Circuit prescribed through its en banc guidance. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed.

Cir. 2005) (*en banc*). Defendants ask that the Court follow the Federal Circuit's guidance and reject DR's improper attempts to trump the intrinsic evidence with extrinsic evidence, such as the selective dictionary definitions and biased DR company witnesses cited in the Joint Claim Construction Chart. Defendants submit that the intrinsic evidence resolves all of the claim construction disputes and provides an accurate and complete picture of the narrowness of DR's limited supposed contribution to the PACS field.

## II.   BACKGROUND

### A.   Introduction to PACS Technology

Long before the advent of PACS, modalities such as CT, MRI, and X-Ray were used to create images on transparencies or "films." The films were hung for examination and annotation in series on long light boxes according to radiologists' preferences. (*See* Ex. A, '416 Patent, 1:36-40.)[1] For example, one radiologist might prefer that the images be displayed from left to right in rows, while another might want them displayed vertically. After analysis, films were stored in a patient's file.

As computer technologies advanced, these images could be scanned and stored digitally. Later, modalities generated digital images directly, thereby eliminating the scanning step. As modalities producing digital medical images became more widely available and PACS systems continued to develop, the industry searched for standards that would allow seamless integration of different manufacturers' products. By 1988, the ACR-NEMA Digital Imaging and Communications (later "DICOM") standard emerged as the prevailing standard to allow PACS to transmit, manipulate and manage images from different manufacturers' modalities, whether originally digital or scanned from film, and to distribute those images over diverse platforms.[2] The U.S. military, in conjunction with a Loral-Siemens joint venture, began developing an early PACS system in 1991. At the same time, a civilian version was developed and, under Dr. Eliot

---

[1] Exhibit A and the remaining exhibits referenced herein are attached to the Declaration of David Pollock submitted herewith.

[2] Exhibit B, Osman Ratib, "From PACS to the World Wide Web", Health on the Internet (1995), http://www.hon.ch/Library/papers/ratib.html.

3

Siegel's leadership, the first hospital-wide transition to a totally filmless PACS was completed in early 1993.[3]

Today, digital medical imaging is common and PACS use is widespread. Using PACS, hospitals and clinics can store and organize large numbers of medical images. Radiologists can efficiently access and examine patient images on computer displays using computer enhancements not available in the film world. Moreover, radiologists can quickly output work product and/or images from their computer systems to a referring physician. The net effect is an improvement in patient care.

### B. Summary of the Patent-in-Suit

DR's patent concedes that PACS systems existed before DR's alleged invention of the '416 patent. ('416 Patent, 1:41-46.) The patent contends, however, that prior art systems were deficient because they (1) did not allow for the individual preferences of physicians and (2) handled images using conventional file management techniques which treated each image separately and unrelated to each other. ('416 Patent, 1:46 - 2:14.)

DR's patent addresses these deficiencies by storing physician preferences in physician data tables and employing the file-naming rule. Figure 6 of the '416 patent shows a specific database structure that purports to solve the problems. Figure 6 from the '416 patent "illustrates the organization of [an] . . . image database according to the invention." ('416 Patent, 3:62-63.) As such, Figure 6 encapsulates "the invention" in DR's own words and graphics.

As shown in the annotated version of Figure 6, below, the image database according to the invention includes (1) a patient data table that, *inter alia*, identifies the patient's referring physician; (2) physician data tables, one containing diagnosing physician display preferences and one containing referring physician output preferences; (3) an examination file that contains information about how the particular image group is partitioned into image series; (4) the actual image files; and (5) related indexes. ('416 Patent, 5:17-23; 8:33-37; Fig. 6.)

---

[3] Exhibit C, George Wiley, "The Prophet Motive: How PACS Was Developed and Sold," 18 Imaging Economics 13 (May 2005).

FIG. 6

Specifically, the physician data tables are (1) a RADSTAFF.dB data table, which includes diagnosing physicians' "display format" preferences for presenting images to the diagnosing physician using the system and a (2) REF.DOCS data table, which contains referring physicians' output preferences for how they want to receive the diagnosing physician's report from the system once the diagnosing physician is "DONE." ('416 Patent, 9:12-20;13:41-50.)  These diagnosing physician-display and referring physician-output correlations are central to the claimed invention and to numerous disputed claim terms.

## III.  DEFENDANTS' PROPOSED CLAIM CONSTRUCTIONS

### A.  Overview of Legal Standards and Their Application

Defendants base their proposed constructions on the claim language, the specification, and the prosecution history. *Phillips*, 415 F.3d at 1314.  Defendants rely primarily on the claim language because "the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Id.* at 1312; *see also Abbott Labs. v. Syntron Bioresearch, Inc.*, 334 F.3d 1343, 1351 (Fed. Cir. 2003) (claim term construed in the context of the claim as a whole).

Defendants have also relied on the patent specification. *Phillips*, 415 F.3d at 1317 (it is entirely "appropriate for a court . . . to rely heavily on the written description for guidance as to the meaning of claims.") Indeed, the Federal Circuit has stressed "the dominance of the specification in understanding the scope and defining the limits of the terms used in the claims." *On Demand Machine Corp. v. Ingram Indus., Inc.*, 442 F.3d 1331, 1337 (Fed. Cir. 2006). That is because "the person of skill in the art is deemed to have read the claim term not only in the context of the particular claim ... but in the context of the entire patent." *Phillips*, 415 F.3d. at 1313. As the *Phillips* court noted: "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Id.* at 1316.

Finally, Defendants also base their constructions on the patent's prosecution history. *Phillips*, 415 F.3d at 1317. In this instance, Defendants have relied on the prosecution history because it contains numerous arguments to overcome prior art that are inconsistent with DR's broad proposed constructions. *See Genzyme Corp. v. Transkaryotic Therapies, Inc.*, 346 F.3d 1094, 1101 (Fed. Cir. 2003) ("The prosecution history... does not permit a broad interpretation of the claim term" ... because "[d]uring prosecution, the applicant also made arguments to overcome prior art that are inconsistent with a broad interpretation of the claim term."). These arguments and other aspects of the file history are often "of critical significance in determining the meaning of the claims." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

## B. Overview of Disputed Terms

Defendants have assembled the disputed claim limitations in logical groups. As such, the following sections cover (a) physician terms, (b) display terms, (c) output terms, (d) database terms, (e) file-naming rule terms, (f) retrieving at least one image series of an image group term and (g) means-plus-function terms.

In addition, many claim terms in dispute relate to the concept and meaning of "display/displaying" versus "output/outputting." Simply put, DR, through its constructions, improperly equates "display/displaying" and "output/outputting" in an attempt to improperly

20180/2040416.1

broaden the scope of its claims. These terms, however, have separate and distinct meanings in the context of the claims of the '416 patent. Specifically, "display/displaying" relates to a diagnosing physician and how, *inter alia*, a diagnosing physician prefers to view images on the monitor when making a diagnosis on the PACS system. "Output/Outputting" relates to a referring physician and how, *inter alia*, a referring physician prefers to receive the completed diagnosis (diagnosing physician's work product) from the diagnosing physician. The diagnosing physician's work product is thereby transferred outside the system to the referring physician.

This distinction is clear from the intrinsic evidence. Most importantly, the '416 patent claims require that the invention includes *both* concepts. (*See, e.g.*, '416 Patent, 18:36-39, ("physician data tables … includ[e] entries specifying output functions *and* displaying formats")[4]). Moreover, the prosecution history is in accord. (*See* Exhibit D (hereinafter "FH"), DR00195 ("formats image series display 'in accordance with format preferences' specified in a diagnosing physician identifier and outputs images 'according to the output preferences of a referring physician' in a referring physician identifier")). Proper claim construction dictates that this distinction between the display and output terms be maintained.

## C.    Physician Terms

| Disputed Term/Phrase | Defendants' Construction | Plaintiff's Construction |
|---|---|---|
| diagnosing physician (Claims 1, 6, 11 & 14) | **Stipulated Construction:** a radiologist who examines a patient's medical images to make a diagnosis | |
| referring physician (Claims  6, 11 & 14) | the physician who receives the diagnosing physician's work product | a physician who requests a medical image examination |

The '416 patent draws a distinction between two types of physicians, a diagnosing physician who uses the claimed system to make a diagnosis, and a referring physician who receives the diagnosing physician's work product.   The parties agree that a "diagnosing physician" is a radiologist who examines a patient's medical images to make a diagnosis.[5]   They

---

[4] Unless noted as present in the original text, all emphasis within quotations has been added.

[5] DR agreed to Defendants' proposed construction of "diagnosing physician" after the submission of the Joint Claim Construction Worksheet and Chart. Since those submissions, DR also agreed with Defendants that the preamble language of claims 1 and 6 is limiting.

20180/2040416.1

dispute whether, in the context of the '416 patent, the construction of "referring physician" should include the essential role of receiving the diagnosing physician's work product.

Defendants' proposed construction for a "referring physician" is grounded in the claim language and the specification. The '416 patent teaches that diagnosing and referring physicians have distinct roles, a distinction DR's proposed construction disregards. These physician roles are specific to the '416 patent. Therefore, a more generic construction based solely on typical usage in the clinical setting is not appropriate here. In the '416 patent, a diagnosing physician examines the digital images and renders a diagnosis ('416 Patent, 19:42-43 ("presenting images ... for examination by a diagnosing physician")); a referring physician receives that diagnosing physician's work product as an output from the system (e.g., by fax, modem, or printer) ('416 Patent, 20:7-9 (Claim 6) ("specifying output preferences of the identified referring physician *for outputting to the identified referring physician* images from the display"); 20:28-32 ("outputting images ... according to output preferences of a referring physician").

Defendants' proposed construction of "referring physician" captures that essential role – receiving the diagnosing physician's work product as an output from the system. ('416 Patent, 8:16-19.) By advocating a generalized description of a referring physician in medical practice, DR ignores the only role the '416 patent attributes to a referring physician; indeed, DR's proposed construction ignores the '416 patent altogether. Defendants' proposed construction, which is firmly rooted in the intrinsic evidence, should be adopted.

### D.    Display Terms

Consistent with the distinct roles of a diagnosing physician and a referring physician, the '416 patent claims are directed to a system for presenting images to a diagnosing physician for examination. Various "display" terms, which relate to how the images will be presented on a monitor to the diagnosing physician, are addressed in this section.

1

### 1.   "System for Presenting Images"/"Computer Display System"

2

| Disputed Term/Phrase | Defendants' Construction | Plaintiff's Construction |
|---|---|---|
| **system for presenting images** (Claim 1) | a personal computer or workstation, its software, peripherals, on-line storage and monitor | a personal computer or workstation, its software, peripherals, a storage device and a monitor for outputting images |
| **computer display system** (Claims 6, 11 & 14) | a personal computer or workstation, its software, peripherals, on-line storage and monitor | a personal computer or workstation, its software, peripherals, a storage device and a monitor for outputting images |

8

The parties agree that the phrases "system for presenting images" and "computer display system" are synonymous and that they include "a personal computer or workstation," "its software [and] peripherals," and a "monitor." The parties disagree, however, on whether the "monitor" should be construed with the additional limitation "for outputting images." With its proposed constructions, DR attempts to improperly equate outputting with displaying. DR's effort should be rejected.

The claims of the '416 patent make clear that a monitor "displays" or "presents" images. For example, Claim 1 requires "one or more display monitors for displaying," independent Claim 6 similarly requires a "display for displaying," and independent Claims 11 and 14 require a "monitor means for presenting." The '416 patent's claims also make clear that "displaying" and "outputting" are separate concepts that should not be confused. For example, Claim 1 includes a "means … for displaying" and a separate "means for providing an output." Claim 1 also recites "physician data tables … including entries specifying output functions **and** displaying formats" (confirming that these are two different processes). Claims 6, 11, and 14 similarly recite a first data table containing output information and a second data table containing information for displaying images on either a monitor or a display. ('416 Patent, 20:1-17; 21:41-56; 22:62-23:10.)

"Of course, at all times, the language of the claims governs their scope and meaning." *SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331, 1338-39 (Fed. Cir. 2005). Here, the claims dictate that monitors "display" images and that "displaying" and "outputting" are different. As such, DR's naked attempt to alter the role of a monitor from "displaying" to "outputting" must

fail.  Because Defendants' proposed construction is firmly rooted in the claim language and because DR's proposed construction improperly conflates "displaying" and "outputting," the Court should adopt Defendants' construction.

### 2.    "Display format"/"Displaying format"

| Disputed Term/Phrase | Defendants' Construction | Plaintiff's Construction |
|---|---|---|
| display format/displaying formats (Claim 1) | for each diagnosing physician, predetermined settings for the display on the monitor of all image series including mode, layout, size, and coupling of images | is information setting forth for each diagnosing physician the number of rows and columns in the display containers; for example, a 2X2 or 4X4 matrix |

Claim 1 recites physician data tables that include *inter alia* "displaying formats."  The claim further requires images to be displayed according to a "display format" stored in the physician data tables.  The parties dispute the types of information specified in these formats.

Because the phrase "display format" does not have a plain meaning to those skilled in the art, the Court should look to the specification to construe the phrase.  *Phillips*, 415 F.3d at 1316. Defendants' proposed construction of "display format"/"displaying formats" conforms to the patent description for these terms.  The '416 patent states that the display format "specification" includes the attributes set forth in "[t]he second through sixth columns [of Table 63 in Fig. 6]." ('416 Patent, 9:23-27.)  Those five columns (reproduced below) provide data concerning the "mode," "matrix," "couple," "shrink" and "expand" attributes.  Defendants' proposed construction groups these as the "mode, layout (matrix), size (shrink or expand), and coupling of images." ('416 Patent, 9:27-38.)

| RAD NAME | FORMAT SPECIFICATION | | | | | WORKING PALETTE |
|---|---|---|---|---|---|---|
| RAD NAME | MODE | MATRIX | COUPLE | SHRINK | EXPAND | MATRIX |
| ⋮ | ⋮ | ⋮ | ⋮ | ⋮ | ⋮ | ⋮ |

The '416 patent assigns a different meaning to each of these attributes.  "Mode" allows a diagnosing physician to choose between the "monitor" or "series" modes of presentation, which allows the diagnosing physician to view images in a series all at once (monitor), or one at a time

20180/2040416.1

(series).  ('416 Patent, 6:67-7:3; 7:41-44; 9:28-30.)  "Matrix" means a "setting for the number of rows and columns in the display containers."  ('416 Patent, 9:30-31.)  "Couple" means "specifying whether the coupling function is invoked for synchronization of two or more image series in a series mode of presentation."  ('416 Patent, 9:32-34.)  "Shrink" and "expand" mean "specify[ing] whether the rows and columns of the matrix are to be adapted to predefined dimensional parameters for display containers."  ('416 Patent, 9:36-38.)  Therefore, consistent with the patent specification, the terms "display format" and "displaying format" should be construed to mean the diagnosing physician attributes sufficient to display the images, namely, mode, layout, size and coupling of images.

In contrast, DR's construction selects one of the many attributes of "displaying formats," namely the "matrix" setting -- so that DR can improperly equate "displaying" and "outputting."  In so doing, DR asks the Court to contradict the text of the patent, which twice states that the format specification for display on the monitor (i.e., "display format") has at least five attributes.  ('416 Patent, 9:23-25 and 9:27-34.)  DR asks the Court to contradict Figure 6, which shows that the display format is comprised of those same five attributes.  This violates a "fundamental rule of claim construction" -- "that terms in a patent document are construed with the meaning with which they are presented in the patent document."  *Merck & Co., Inc. v. Teva Pharmaceuticals USA, Inc.*, 347 F.3d 1367, 1371 (Fed. Cir. 2003).

### 3.    "Mode Preferences"

| Disputed Term/Phrase | Defendants' Construction | Plaintiff's Construction |
|---|---|---|
| mode preferences (Claims 6, 11 and 14) | prespecified diagnosing physician settings that determine whether a diagnosing physician prefers all image series be displayed in monitor or series mode | information that specifies a particular diagnosing physician's choice of rules for controlling the organization applied to all the images in an image group that are output to a monitor; for example, monitor or series mode |

Independent Claims 6, 11, and 14 require a "second data table" or "second table data structure" that includes multiple diagnosing physician identifiers as well as "format preferences" and "mode preferences" of the diagnosing physicians.  The parties agree that "format preferences"

11
DEFENDANTS' CORRECTED OPENING CLAIM CONSTRUCTION BRIEF
CASE NO. 06 CV 0417 B(NLS)

refer to the number and arrangement of presentation areas in which a diagnosing physician prefers all image series to be viewed. They disagree, however, on the meaning of "mode preferences" for the diagnosing physician.

The claims describe exactly two modes, "monitor" and "series." (*See e.g.*, '416 Patent, Cl. 2, 7 "a first mode is a monitor mode and a second mode is a series mode".) The specification also defines only two display modes -- "monitor" and "series" modes. ('416 Patent, 7:16-50.) The claims and specification also repeatedly make clear that the diagnosing physicians each prefer one mode or the other. ('416 Patent, Claim 7, 13 ("each mode field specifying *a* mode of image series presentation"); 1:58-59 ("each radiologist has *a highly personal mode* of examination."); 7:16-50.) The intrinsic evidence fully supports Defendants' proposed construction.

In contrast, DR's proposed construction is problematic in several respects. First, DR's proposed construction contemplates some other, undisclosed (and nonexistent) modes. The claims, specification, and prosecution history, however, do not describe any additional modes. On this basis alone, DR's construction is incorrect. *On Demand*, 442 F.3d at 1340 ("the claims cannot be of broader scope than the invention set forth in the specification."); *Scimed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1341 (Fed. Cir. 2001) ("when the 'preferred embodiment' is described as the invention itself, the claims are not entitled to a broader scope than that embodiment") (*quoting Wang Labs. Inc. v. America Online, Inc.,* 197 F.3d 1377, 1383 (Fed. Cir. 1999)).

Next, DR attempts to broaden "mode preferences" to mean *any* "information that specifies a particular diagnosing physician's choice of *rules for controlling the organization applied to all the images in an image group that are output to a monitor*; for example, monitor or series mode." DR's overly broad definition improperly captures within the meaning of "mode preferences" every parameter relating to display of images in any sense, and includes columns from the "format specification" table other than the mode column -- i.e., matrix, couple, shrink, and expand. Functionally, none of these display parameters specifies (or is necessarily even

relevant to) a choice of mode.  Common sense suggests that the "mode column" in a physician data table would contain physicians' "mode preferences."

Finally, by construing "mode preferences" to somehow relate to "outputting to a monitor" rather than "displaying on a monitor," DR's proposed construction again attempts improperly to equate "output" and "display" as described above in the context of Section III.B.  In sum, the Court should construe "mode preferences" consistently with the claims and specification to mean "prespecified diagnosing physician settings that determine whether a diagnosing physician prefers all image series be displayed in monitor or series mode."

**E.     Output Terms**

Whereas the "display" functions recited in the patent relate to the diagnosing physician's role of examining images, "output" relates to how a referring physician receives the work product. After the diagnosing physician has indicated completion of an examination of images, her work product is output from the system to a referring physician.  ('416 Patent, 9:15-20.)  The '416 patent teaches that the system's output of images occurs according to the referring physician preferences.  ('416 Patent, 13:41-50.)  The various terms in this section relate to how the referring physician receives these outputted images from the diagnosing physician.

These relevant "output" phrases appear in the independent claims of the '416 patent in several forms:  "output functions" (Claim 1), "output preferences" (Claims 6, 11, and 14), "providing an output from the system" (Claim 1), and "outputting images" (Claim 6, 11, and 14). Guided by the intrinsic evidence, each of these phrases refer to a diagnosing physician's work product that is printed, faxed, or otherwise transferred outside of the system to a referring physician, based on the referring physician's output preferences.

### 1.    "Output Functions"

| Disputed Term/Phrase | Defendants' Construction | Plaintiff's Construction |
|---|---|---|
| output functions (Claim 1) | non-display actions that transfer a diagnosing physician's work product, including images, outside of the system to a referring physician according to that referring physician's prespecified preferences | is an action to be carried out by a program to control the organization applied to all the images in an image group when displayed for a diagnosing physician; for example, series or monitor mode |

The difference between the parties' constructions is that Defendants construe "output functions" as the manner in which the referring physician receives work product from the diagnosing physician, while DR eliminates the referring physician and the concept of transferring the work product outside of the system from the claim entirely. "Output functions" does not have a plain meaning, and therefore, the Court should look to the claims and the specification to construe "output functions." *Phillips,* 415 F.3d at 1320-21 ("[T]he specification is 'the single best guide to the meaning of a disputed term.'") (citations omitted); *Network Commerce, Inc. v. Microsoft Corp.*, 422 F.3d 1353, 1360-61 (Fed. Cir. 2005).

Claim 1 requires "physician data tables ... [which] includ[e] entries specifying output functions *and* displaying formats." Because Claim 1 itself calls for both output and display, they cannot mean the same thing. *Bancorp Servs., L.L.C. v. Hartford Life Ins. Co.*, 359 F.3d 1367, 1373 (Fed. Cir. 2004) (use of two terms in close proximity in same claim infers a different meaning should be assigned to each); *Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*, 93 F.3d 1572, 1579 (Fed. Cir. 1996) (if two claim terms describe only one element then the claim should refer to the element with one or the other of the two terms, not both). Defendants' construction respects this distinction between outputting and displaying by requiring that outputting be a non-display action.

The intrinsic evidence requires that "output functions" be based on *referring* physician preferences. The functions in the specification that plainly correspond to "output functions"[6] are

---

[6] "Output functions" does not appear in the patent specification because DR added it to the claims long after the patent application was filed.

the DONE functions. The DONE functions are stored in the referring physician data table and indicate the preferred output of the referring physician. (*See* '416 Patent, 11:23-24 ("The DONE button, when activated, invokes the 'DONE' functions of the referring physician.").) Another example is that physician data tables require indexes to "unique group identifications." The only physician data table described in the '416 patent that is linked to "unique group identifications" is the *referring* physician data table (REF.DOCS 52 in Fig. 6).

The referring physician data table also illustrates the concept of transfer outside of the system – the DONE functions contained in that table include printing, faxing, or otherwise transferring work product out of the system to the referring physician. ('416 Patent, 13:41-50.) Additionally, Claim 1 requires providing an output "**from** the system according to an output function," which shows that the concept of transferring work product outside of the system is necessary. ('416 Patent, 18:52-53).

The '416 prosecution history also requires that "output functions" relate to a referring physician's prespecified preferences. DR linked "output functions" to a referring physician and to transferring a diagnosing physician's work product out of the system when trying to overcome a prior art-based rejection. (FH, DR000194-DR000195.) DR also argued that the prior art did not teach output of images "according to the output preferences of a referring physician." DR specifically explained that later issued Claim 11 "effectively automate[s] the display and output of images according to prespecified physician preferences that are stored in the system." (FH, DR000194.) DR later admitted that its reasoning and explanation of the invention applies to all of the claims (including application Claim 20 which issued as Claim 1 of the '416 patent). (FH, DR000195.) Accordingly, DR's own arguments and admission establish that (1) display and output are separate concepts, (2) output is based on the referring physician's preferences, and (3) the output is sent to the referring physician outside the system.

The intrinsic record simply does not support construing "output functions" to mean the display presented to a diagnosing physician, as DR proposes. The Court should adopt Defendants' proposed construction because all of the intrinsic evidence confirms that output functions

predetermine the method for transferring to a referring physician outside the system the tangible non-display work product from the diagnosing physician.

### 2.     "Output Preferences"

| Disputed Term/Phrase | Defendants' Construction | Plaintiff's Construction |
|---|---|---|
| **output preferences** (Claims 6, 11 & 14) | settings specifying a preferred choice, from amongst multiple output functions, of how images are transferred outside of the system | information specifying how a particular referring physician wants to receive images from a diagnosing physician |

Unlike the phrase "output functions" in Claim 1,  which DR associates with the diagnosing physician, DR admits that "output preferences" relates to work product transmitted from the diagnosing physician to the referring physician in Claims 6, 11, and 14.  DR therefore concedes, as it must, that "output preferences" contain information specifying how a particular referring physician wants to receive output images from a diagnosing physician.  The parties' main disagreement turns on whether the intrinsic record requires the images to be transferred outside the system to the referring physician according to his output preferences.

Claim 6 includes the step of storing a "first data table" having "***output preferences*** of the identified referring physician for outputting to the identified referring physician images from the display." ('416 Patent, 20:1-9.)  Claims 11 and 14 include a "first data table structure" containing "***output preferences*** of the identified referring physician for outputting to the identified referring physician images from the monitor means." ('416 Patent, 21:41-49; 22:62-23:2.)

The specification demonstrates that "output preferences" relate to how a referring physician receives the diagnosing physician's work product.  In more detail, the specification describes that the diagnosing physician's work product is transmitted to a "predetermined location" when the "DONE functions" are executed. ('416 Patent, 13:41-50).  As described above, the "DONE" functions cause the referring physician's output functions to be performed.  Since the specification describes that the diagnosing physician's work product is transmitted to a predetermined location, it follows that the work product must be sent outside of the system.

Moreover, DR amended the claims to recognize that the output process is handled "according to the output preferences of a referring physician" (FH, DR000179, 186, 187, 189), who has chosen from multiple prespecified options, such as print, fax, or modem.  ('416 Patent, 13:41-50.)  The Court should adopt Defendants' construction based on all of the intrinsic evidence.

### 3.   <u>"Providing an Output from the System"/ "Outputting Images"</u>

| Disputed Term/Phrase | Defendants' Construction | Plaintiff's Construction |
| --- | --- | --- |
| **providing an output from the system according to an output function specified in the physician data tables** (Claim 1) | automatically transferring a representation of a palette display container, including images, to a referring physician outside of the system in accordance with the output function stored in the physician data tables for that referring physician when the diagnosing physician indicates that his examination is complete | to process information in a diagnosing physician data table to determine how to generate an image series in a manner defined by an output function for the diagnosing physician |
| **outputting images** (Claims 6, 11 & 14) | automatically transferring images from a palette display container to a referring physician outside of the computer display system when the diagnosing physician indicates that his examination is complete | providing a visual representation of an image according to the referring physician's output preferences |

Claim 1 has a "means for ***providing an output from the system*** according to an output function specified in the physician data tables."  Claims 6, 11 and 14 require "***outputting images*** … according to output preferences of a referring physician identified by a referring physician identifier indexed from the group identification."

As discussed above, phrases calling for an output (such as "output functions" and "output preferences") require the transfer of tangible non-display work product from or outside of the system to the referring physician.  That the work product is sent outside of the system is reinforced by the claim terms of providing an output "from the system" (Claim 1) and "outputting" images (Claims 6, 11 and 14).  Furthermore, as set forth above, Defendants consistently distinguish the term output, such as in "output functions" (Claim 1), from the display terms, such as "displaying formats" (Claim 1), as required by the canons of claim construction.  *Bancorp Servs.,* 359 F.3d at

1373.  In contrast, DR again blurs the distinction between output and display in an attempt to eliminate the role of the referring physician from the claims.

In the '416 patent's system, "output" of the diagnosing physician's work product occurs "automatically," once a diagnosing physician completes his examination and presses the "DONE button." ('416 Patent, 13:41-43.)  The prosecution history reinforces the "automatic" nature of the "output."  DR argued that its amended claim elements *automate* the display and output of images according to prespecified physician preferences that are stored in the system." (FH, DR000194.)

The output work product includes a "working palette display container populated with images selected by the diagnosing physician." ('416 Patent, 13:41-50; 8:10-19.)  In combination, "providing an output" and "outputting images" requires the automatic transfer of the palette display container when the diagnosing physician completes his examination.  The Court should adopt Defendants' proposed constructions because the intrinsic evidence requires all of the limitations discussed above.

**F.    Database Terms**

The database terms discussed below relate to the manner in which the claimed system stores the diagnosing physician display and mode preferences and referring physician output functions and preferences.

**1.    "Data Table" / "Table Data Structure"**

| Disputed Term/Phrase | Defendants' Construction | Plaintiff's Construction |
|---|---|---|
| data table (1, 2, 6) / table data structure (Claims 11, 14) | fields that are organized and stored in the form of indexed rows and columns | an arrangement of information in a form suitable for ready reference |

Defendants' proposed construction of "data table" and "table data structure" is the ordinary meaning of these synonymous phrases.  The patent's figures, specification, prosecution history, and cited references confirm this.  In contrast, DR's proposed construction ignores the intrinsic record and deletes the definitional aspects of these phrases - including that a table is composed of rows and columns.  As a result, DR's proposed construction includes virtually every arrangement of data, including arrangements that indisputably are *not* tables.

1   The claims support Defendants' proposed construction, explicitly requiring: (a) indexes

2   (Claims 1, 6, 8, 11, 14); (b) data fields (Claims 6, 7, 11, 14) or entries (Claims 1, 2); and (c) that

3   the categories of information in the tables be organized according to the physician to which that

4   category pertains (e.g., the referring physician's output functions or preferences (Claims 1, 6, 11,

5   14) or the diagnosing physician's display formats (Claims 1, 6, 11, 14)).

6   The four "data tables" in the Figure 6 of the '416 patent further support Defendants'

7   construction. ('416 Patent, Fig. 6 items 50, 52, 53, and 63.) The text describing Figure 6,

8   confirms that the diagnosing physician data table is, in fact, a table. ('416 Patent, 9:27-28

9   ("columns two through six of the **Table** 63").) Also, Figure 6 shows that each data table consists

10   of data fields[7] arranged in columns and rows (*e.g.*, table 63 has seven columns; table 53 shows

11   three rows of data, plus the "header"). The data tables in Figure 6 also include indexes[8] to permit

12   access to, and between, the data in the tables.

13   The specification describes the rows, columns, and indexes of these data tables (*e.g.*, '416

14   Patent, 10:4-6 ("the format specification and working palette matrix size in the same

15   RADSTAFF.dB *row* are provided to the application process"); 9:20-21 ("A RADSTAFF.dB file

16   63 includes at least seven *columns*."); 9:12-14 ("the PATIENT.dB file includes a REFERRING

17   PHYSICIAN column containing values which *index* **to** entries in a REF.DOCS file 52").

18   The prosecution history further supports Defendants' proposed interpretation. In a March

19   1995 Response to the Examiner's obviousness rejections, DR acknowledged that Figure 10 of the

20   Yamada reference (U.S. Patent No. 5,235,510) discloses a table comprised of fields arranged in

21   rows and columns with indexes. (FH, DR000193-194.) However, DR argued for patentability

22   because "[t]here are no fields in *this table* for specifying 'format preferences' of a 'diagnosing

23   physician'." *Id.* Thus, the Court should adopt Defendants' proposed construction because all of

24

25

26   [7] Each side agrees that "field" is a location in a data table and that information input into that
27   field is an "entry" in the data table. *See* Joint Claim Construction Chart ("JCCC").
    [8] As shown in Section III.F.3 an "index" is a pointer to information at another location.

28

the intrinsic evidence is consistent in defining "tables" as comprised of "fields that are organized and stored in the form of indexed rows and columns."

### 2.  "Physician Data Tables"

| Disputed Term/Phrase | Defendants' Construction | Plaintiff's Construction |
|---|---|---|
| **physician data tables** (Claims 1, 2) | data tables organized by referring and diagnosing physician that contain preferences for each respective physician | an arrangement of data that is specific to a particular diagnosing physician and in a form suitable for ready reference |

As discussed above, the '416 patent distinguishes between diagnosing and referring physicians. Each group gets their own set of data tables. As the '416 patent and its prosecution history teach, "physician data tables" are, as Defendants propose, data tables organized by referring and diagnosing physician, containing their respective preferences. In contrast, DR compounds the errors in its construction of "data table", above, by here ignoring the plural form of "physician data tables" and by improperly limiting "physician data tables" to a "particular diagnosing physician."

The patentees' use of the word "tables," which DR's litigation-inspired, proposed construction ignores, was an important word choice. The specification teaches, and Claim 1 requires, two "physician data tables" containing data pertaining to each category of physicians, "diagnosing" and "referring." Both of these "physician data tables" are required to effectively store, retrieve, and provide images from a diagnosing physician to a referring physician, which is a central point of the purported invention. ('416 Patent, 8:24-68; Fig. 6; 9:15-39; Claim 1, 6, 11, 14.)

The file history cements Defendants' construction. In September 1994, the Examiner rejected the pending claims as obvious over the combination of Yamada, which has a single physician data table, and Cecil, another prior art reference. (FH, DR000167-173.) In its March 1995 Response, DR canceled claims, amended all remaining claims to distinguish over the cited prior art combination, and made these specific arguments for patentability (FH, DR000193-195):

> Specifically, Yamada and Cecil do not teach or suggest "a first table data structure" in which "referring physician identifiers" are "indexed from at least one group identification", where the physician identifiers include a field specifying "output preferences" of identified referring physicians. These references further

omit any reference to "a second table data structure in which "diagnosing physician identifiers" are stored, each "including respective fields specifying format preferences and mode preferences" of an identified diagnosing physician.

DR summarized its position: "Yamada (and Cecil) do not teach or suggest that [the data tables] be structured, limited, and used as recited in the independent claims of this application." (FH, DR000194.) DR confirmed that these arguments applied to all pending claims, arguing that each independent claim was "patentable for similar reasons." *Id.* In direct response to these "physician data table" arguments, the Examiner allowed the amended claims.

Having relied on the existence of two separate "physician data tables," one for the "referring physician" and one for the "diagnosing physician," to overcome a prior art rejection, DR cannot now take an inconsistent position. *Genzyme,* 346 F.3d at 1101.

### 3.   "Index"

| Disputed Term/Phrase | Defendants' Construction | Plaintiff's Construction |
|---|---|---|
| **index**<br>indexed by (1, 4, 6, 8, 9, 11, 14); indexes to (1); indexing (6); indexed from (6, 11, 14)[9] | a value in a database that points to corresponding information at another location | using one piece of information to locate other information |

The proper construction of the term "index" is a value in a database that points to corresponding information at another location. The claims, specification, and prosecution history support this construction, which, in fact, is lifted directly from the specification. In contrast, DR proposes the almost limitless construction of "using one piece of information to locate other information." DR's construction has nothing to do with the claimed image database and is so broad that it includes anything from using a telephone book to find a telephone number to using the Internet to obtain a stock quote.

The '416 patent claims recite three sets of indexes, each of which describe a value in a database that points to corresponding information at another location. ('416 Patent, Claim 1 (index from the physician data tables to group identifications); Claim 6, 11, 14 (index from a

---

[9]   For efficiency, Defendants' propose a construction of only the root word "index" and assume that agreement can be reached regarding each related term following claim construction.

group identification to referring physician identifier); Claim 1, 6, 11, 14 (index from the group identification to image group).

The specification also describes three sets of indexes: (1) indexes from the referring physician field in the "patient data table" to the corresponding row in "referring physician data table"; (2) indexes from the ROOTNAME entries in the "patient data table" to the "examination file"; and (3) indexes from the image series in the "examination file" to the corresponding images in the "image files." Each of these three sets of indexes, which are highlighted in green in the colorized version of Figure 6, *supra*, at 4, is a value in a database that points to corresponding information at another location.

Its litigation positioning aside, DR's use of the term "index" when it filed the '416 patent is precisely what Defendants now propose. The '416 patent confirms that the ROOTNAME field in the "patient data table" ***points to*** the "examination file" (ROOTNAME.PAT). ('416 Patent, 8:37-39 ("For any patient identification entered in the file 50, its corresponding ROOTNAME ***points to*** an examination file such as the file 53"). DR even chose to represent each of the indexes in Figure 6 with arrows that point from one location in the database to another.

The file history provides further support for Defendants' construction. The Examiner characterized an "index" as a "mapping" of data in one location to another. (*See* FH, DR000171) (the indexes between the "patient data table" and the "referring physician data table" are "'referring physicians' being ***mapped to*** 'one or more image output functions'"). DR used the same language to distinguish over Yamada. (FH, DR000194) ("Yamada … annotates image data with a physician identifier that ***maps to*** administrative data, not to output preferences."). By using an "index" to "map to" another data table as set forth in these excerpts, both the Examiner and DR applied the plain meaning of "index", i.e., a pointer from one database location to another location.

### 4. "Physician Identifier"

| Disputed Term/Phrase | Defendants' Construction | Plaintiff's Construction |
|---|---|---|
| physician identifier (Claims 1, 6, 7, 11, 13, 14, 16) | a value contained in a field of a data table that uniquely identifies a physician | information associated with a particular diagnosing physician to the exclusion of all other physicians |

According to the intrinsic evidence, "physician identifier" undoubtedly is a value that uniquely identifies a physician. In the context of PACS and the image database of the '416 patent, a "physician identifier" is a value in a data table "field" that uniquely identifies a physician. DR's construction ignores that a "referring physician" also must have a "physician identifier" to receive an output of the "diagnosing physician's" work product. DR's construction also completely abandons database terminology to capture any "information associated with" a "diagnosing physician." DR cannot substantiate either aspect of its proposed construction.

In contrast, the specification confirms Defendants' construction by referencing to diagnosing physicians by name (RAD NAME) in the RADSTAFF table and by referencing to referring physicians by name in the PATIENT.dB and REF.DOCS tables. As such, the intrinsic evidence establishes that both categories of physicians must have identifiers and that both identifiers are fields in "physician data tables." ('416 Patent, Fig. 6.) In describing how a referring physician's identifier is linked to a patient's image series, the specification teaches that "[a] patient identification, the corresponding ROOTNAME, and an *identification of a referring physician* are entered for each patient examination into a database file 50 entitled "PATIENT.dB". ('416 Patent, 8:26-37.) This passage supports all aspects of Defendants' construction: a "physician identifier" is a value; it is unique; it is a field in a data table, such as PATIENT.dB; and it is required for both "diagnosing" *and* "referring physicians." ('416 Patent, 9:15-17.)

The Court should adopt Defendants' proposed construction because it follows from the intrinsic evidence, and recognizes that both "diagnosing" *and* "referring" physicians have "physician identifiers" set forth as database fields.

### 5.  "Image Database"

| Disputed Term/Phrase | Defendants' Construction | Plaintiff's Construction |
|---|---|---|
| image database (Claims 1, 6, 11 & 14) | stored image files, physician data tables, and indices | a collection of computerized information that enables storage and retrieval of images |

Defendants' proposed construction for "image database" comports with the specification and DR's only description of this disputed phrase: "stored image files, physician data tables, and

indices." ('416 Patent, 5:17-23.)  DR's proposed construction ("a collection of computerized information that enables storage and retrieval of images") is limitless and lacks any support in the '416 patent.

The "image database" that the '416 patent describes is not a general, unlimited "collection of computerized information" – a phrase not found in the patent – as DR contends.  Instead, the phrase is much more narrowly defined in the context of the '416 patent.  Specifically, the '416 patent describes that the "image database" consists of stored images and the necessary indices which point to corresponding information within the data tables:

> An image database 24 includes one or more conventional on-line storage devices for storage of medical image data representations which have been generated as described above. Therefore, the *image database 24 includes* not only the storage hardware, but also *the stored images and all necessary indices*. ('416 Patent, 5:17-23.)

The '416 specification also states that Figure 6 "illustrates the organization of a medical *image database according to the invention*."   ('416 Patent, 3:62-63; 8:24-26 ("FIG. 6 illustrates the structure of the image database which enables the efficient storage and retrieval of image series."))  In turn, Figure 6 depicts the image files (Item 55 Image.db), physician data tables (Tables 52 REF.DOCS and 63 RADSTAFF.DB), and index components of the image database.  Accordingly, Defendants' proposed construction of "image database" is consistent with the specification and the only manner in which it is described in the '416 patent.

## G.   File-Naming Rule Terms

The '416 patent's "file-naming rule" dictates the proper construction of disputed claim terms which relate to grouping and ordering image series.  This rule describes packing information into the file name of each image that identifies:  (1) the group to which the image belongs; and (2) the order of the image in a particular image series.

The patent describes the application of its file-naming rule and the critical role that rule plays in carrying out the "invention." ('416 Patent, 8:24-57; Fig. 6.)  First, the invention assigns a unique "ROOTNAME" to an image group so that the "image files" of all series within that group "are named ROOTNAME.XXX." ('416 Patent, 8:30-47.)  The "ROOTNAME" portion of the file

name is the same for all image files in the group, regardless of series.  (*Id.*)  Therefore, all images

within the group can be identified as a unit by the "ROOTNAME" portion of their file name.

The ".XXX" portion of the file name corresponds to the order of the images within an

image series.  ('416 Patent, 8:49-51 ("[T]he sequence position of the named file corresponds to the

sequence position of the image it contains.").)  The specification sets forth specific examples that

apply the rule in which "image 1 in the axial T1 series has a file name ROOTNAME.1, the second

image in this series is in a file named ROOTNAME.2, and so on."  ('416 Patent, 8:52-55.)  The

second images series (e.g. axial T2 series) begins after the end of the first series, with the file

name suffixes likewise being a numerical value representing their respective positions in the

second series.  ('416 Patent, 8:55-57) ("Similarly, the n images of the axial T2 series are stored in

files consecutively numbered as ROOTNAME.m through ROOTNAME.(m+n).")

In its own words, DR described the important role played by the file-naming rule in

achieving the purported advantages of the invention:

> The file-naming rule for image series *is important to the invention because* it
> preserves the unique identity, and the order, of each image series. For any given
> ROOTNAME, an image series can be identified by reference to the ROOTNAME
> file 53 and manipulated, as a unit and independently of any other image series, by
> the system of FIGS. 1 and 2. *This provides a very significant advantage over the*
> *existing systems which treat each image as an independent unit,* unconnected
> with any other image in its sequence or with any other image in any other series
> or group. ('416 Patent, 9:1-11)

Through these unequivocal statements, DR required use of the file-naming rule to group images

and order them within their series and disclaimed systems that do not follow such a rule.  *See, e.g.,*

*SciMed Life,* 242 F.3d at 1341 ("Where the specification makes clear that the invention does not

include a particular feature, that feature is deemed to be outside the reach of the claims of the

patent, even though the language of the claims, read without reference to the specification, might

be considered broad enough to encompass the feature in question."); *Honeywell Int'l, Inc. v. ITT*

*Indus., Inc.,* 452 F.3d 1312, 1318-19 (Fed. Cir. 2006).

Tellingly, DR chose to call its naming convention a "rule," confirming that it is a

mandatory aspect of the invention.  *See Astrazeneca AB v. Mutual Pharm. Co.,* 384 F.3d 1333,

1339-40 (Fed. Cir. 2004) (finding implicit disavowal based on the inventor's chosen lexicon).  DR

also stressed that the "file-naming rule is **important** to the invention." *Toro Co. v. White Consolidated Indus., Inc.*, 199 F.3d 1295, 1301 (Fed. Cir. 1999) (finding disclaimer because, *inter alia*, the specification described "the advantages of the unitary structure as ***important to the invention***."); *Inpro II Licensing, S.A.R.L v. T-Mobile USA, Inc.*, 450 F.3d 1350, 1354 (Fed. Cir. 2006) (affirming narrow construction because of a single embodiment that the specification emphasized as a "***very important feature***").

DR further praised the "very significant advantage" of its file-naming rule, while at the same time disparaging prior art systems where "the images are individually identified and processed for storage and presentation without correlation to other images in their respective sequences." ('416 Patent, 2:4-7; 9:7-11.)  This plainly limits the claims to only cover systems that likewise apply the rule to name image files. *Honeywell*, 452 F.3d at 1318-19 (finding disclaimer and limiting claims to the disclosed embodiment where specification demeaned the prior art's perceived shortfalls).  Lastly, DR's only embodiment in the '416 patent uses the file-naming rule. *Inpro II*, 450 F.3d at 1354; *Honeywell,* 452 F.3d at 1318 (finding disclaimer where, *inter alia*, the only embodiment disclosed addressed problems in the prior art).

DR thus called file-naming a rule, asserted file-naming to be important, characterized file-naming as the invention, contrasted file-naming with the prior art, and disclosed file-naming as its only embodiment.  Each of these actions operates as a disavowal of subject matter – collectively, the intrinsic evidence overwhelmingly establishes a disavowal of systems that do not use the rule. *See, e.g., Alloc, Inc. v. U.S. Int.'l Trade Comm'n*, 342 F.3d 1361, 1370 (Fed. Cir. 2003) (limiting claim scope where "the specification read as a whole suggests that the very character of the invention requires the limitation part of every embodiment.").  With this backdrop, the claim construction disputes relating to the rule should be resolved readily in favor of Defendants.

### 1.   "Images Being Separated Into (a Plurality of) Image Groups"

| Disputed Term/Phrase | Defendants' Construction | Plaintiff's Construction |
|---|---|---|
| the images being separated into (a plurality of) image groups (Claims 1, 6, 11 & 14) | assigning filenames to the images that identify the image group to which they belong | assigning images an identifier that is specific to a particular image group |

20180/2040416.1

Consistent with the import given by the specification to the file-naming rule by the specification, each of the asserted claims requires the images to be separated into image groups. The parties agree that this limitation requires the images to be separated into groups by assigning a value that is unique to the group. They disagree whether that value is part of the file name, as Defendants propose, or more broadly refers to any "identifier," as DR proposes.

Defendants' proposed construction adheres to the file-naming rule in the patent specification. From the start, the specification asserts that "the medical images are structured into groups." ('416 Patent, Abstract.) According to the rule, the image file name itself includes the identification of the image group (e.g. ROOTNAME) to which the file belongs. ('416 Patent, 8:30-47.) As explained above, the specification teaches that the "invention" assigns unique file names to image files of an examination so that they may be treated as a unit (e.g., ROOTNAME).

The specification does not merely describe the file-naming rule as an exemplary embodiment. Instead, it asserts that the rule is "important to the invention." ('416 Patent, 9:1-2.) Statements referring to the "invention" are generally entitled to special weight in claim construction. *See, e.g., Watts v. XL Systems, Inc.*, 232 F.3d 877, 883 (Fed. Cir. 2000). By specifically emphasizing the grouping of images according to the file-naming rule, DR cannot now broaden this limitation by ignoring its own lexicography and disclaimer. *See Cultor Corp. v. A.E. Staley Mfg. Co.*, 224 F.3d 1328, 1331 (Fed. Cir. 2000) ("Claims are not correctly construed to cover what was expressly disclaimed.") Thus, the Court should adopt Defendants' construction.

## 2.  "Each Image Series Being Ordered..."

| Disputed Term/Phrase | Defendants' Construction | Plaintiff's Construction |
|---|---|---|
| each image series being ordered by assignment to each image in the image series of a (numerical) position in a respective monotonically changing sequence[10] (Claims 1, 6, 11 and 14) | each image file is assigned a (numerical) filename that corresponds to its order in an image series | each image in a collection of images is assigned a numerical value representing its order in the sequence |

---

[10]  This phrase appears in claims 1 and 6 without the term "numerical" and in Claims 11 and 14 with the term "numerical."

Each of the asserted claims further requires the ordering of each image series "by assignment to each image in the image series of a (numerical) position in a respective monotonically changing sequence." The parties' dispute here also turns on whether the file-naming rule should be treated as a "rule," in which case images are ordered by using filenames as Defendants propose, or whether any "value" will suffice as DR proposes.

According to the specification, the "invention" requires assigning sequentially named or numbered file names. ('416 Patent, 8:42-51 ("Each image series in an image group is indexed to a set of sequentially named or numbered files in which the images of the series are contained . . . such that the sequence position of the named file corresponds to the sequence position of the image it contains.")) In its only example, the specification explains that "image 1 in the axial T1 series has a file name ROOTNAME.1, the second image in this series is in a file named ROOTNAME.2, and so on" in accordance with the file-naming rule. ('416 Patent, 8:52-55.) There is no support for expanding the rule's file naming convention to allow for *any* "value," located *anywhere* in or associated with image files. *See Inpro II,* 450 F.3d at 1354 (claim limited to disclosed feature where that feature was described as important to the invention). Again, DR cannot recover what it already disclaimed.

### 3.    "Unique Group Identification"

| Disputed Term/Phrase | Defendants' Construction | Plaintiff's Construction |
|---|---|---|
| unique group identification (Claims 1, 6, 11 and 14) | a value which is algorithmically derived from identification of a patient and the number and types of sequences taken by a modality | information associated with a particular image group to the exclusion of all other image groups; for example, an exam ID |

Finally, the asserted claims require a "unique group identification." Because this phrase does not have a single meaning to those skilled in the art, it is appropriate to rely on the patent specification to discern its meaning. *Phillips,* 415 F.3d at 1316. Defendants' proposed construction follows the file-naming rule and the '416 patent's teaching of how a ROOTNAME (i.e. "unique composite patient identifier," '416 Patent, 8:30-32) is derived.

> When an MRI apparatus is used to generate images, examination protocols normally provide for identification of the patient, and set out the number and types of sequences which are to be taken and the anatomical target of interest. From this information, *a unique composite patient identifier (ROOTNAME) is*

*algorithmically derived*. A patient, thus, has a unique ROOTNAME for each MRI examination. ('416 Patent, 8:26-32.)

The specification thus explains that the identifier ROOTNAME is derived from multiple pieces of information – a patient's name or "id," the number and types of sequences to be taken and the anatomical target.

As a practical matter, the ROOTNAME value enabled DR's system to keep track of such information on the basis of file names, which is "important to the invention." ('416 Patent, 9:1-2.) Despite this straightforward requirement, DR seeks to have any information associated with an image group, such as "exam ID 1234," serve as the ROOTNAME. Without support for such a broad construction, the Court should adopt Defendants' proposed construction, which tracks the intrinsic evidence. *See Modine Mfg. Co. v. U.S. Int'l Trade Comm'n*, 75 F. 3d 1545, 1551 (Fed. Cir. 1996), opinion reinstated by *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722 (Fed. Cir. 2002) ("when the preferred embodiment is described in the specification as the invention itself, the claims are not entitled to a scope broader than that embodiment").

**H.    Retrieving at Least One Image Series of an Image Group**

| Disputed Term/Phrase | Defendants' Construction | Plaintiff's Construction |
|---|---|---|
| **retrieving at least one image series of an image group** (Claims 1, 6) | entering an image series into working memory as a unit, with images of the series in sequence order | recovering an image series of an image group from a storage device |

Defendants propose a construction for "retrieving at least one image series of an image group" consistent with the manner in which DR defined this phrase in the '416 Patent: "entering an image series into working memory as a unit, with images of the series in sequence order." The specification confirms Defendants' proposed construction, explaining that the software of the system, upon obtaining an image group file of one or more series obtained during an examination, extracts and enters the entire image series in "linked list," or sequential form, into the working memory:

> When a patient is identified to the application process 12, the application process determines a ROOTNAME value for that patient, obtains a ROOTNAME.PAT file, and commands the image subsystem to extract the image series contained in the ROOTNAME file sequence defined by the ROOTNAME.PAT file and place them in linked list form in the working memory 33. ('416 Patent, 8:58-68)

Moreover, DR specifically touted handling of the image series as a unit as a "significant advantage" over the existing systems" which treated each image itself as an independent unit:

> For any given ROOTNAME, an image series can be identified by reference to the ROOTNAME file 53 *and manipulated, as a unit and independently of any other image series*, by the system of FIGS. 1 and 2. This provides a very significant advantage over the existing systems which treat each image as an independent unit, unconnected with any other image in its sequence or with any other image in any other series or group. ('416 Patent 9:1-11)

Thus, Defendants' construction is consistent with the specification. Having touted the very construction Defendants propose as providing it with a "significant advantage" over existing systems, DR cannot now retreat from the teachings of the patent in order to capture a broader meaning. *See Toro*, 199 F.3d at 1301; *Inpro II*, 450 F.3d at 1354.

## I.     Means-Plus-Function Terms

### 1.     Overview of Legal Standards and Their Application

#### (a)     Legal Standards and Their Application by Defendants

Claim limitations drafted in "means-plus-function" format are limited in scope to the structure disclosed in the specification and "equivalents" of the disclosed structure. 35 U.S.C. § 112, ¶ 6. If one employs means-plus-function language in a claim, one must set forth in the specification an adequate disclosure showing what is meant by the claim language. *Default Proof Credit Card System, Inc. v. Home Depot U.S.A., Inc.,* 412 F.3d 1291, 1297 (Fed. Cir. 2005). When construing a "means-plus-function" limitation, the Court must analyze the specification to ascertain disclosed structure for performing the specified function. *Omega Eng'g, Inc. v. Raytek Corporation*, 334 F.3d 1314, 1321 (Fed. Cir. 2003). Construction of a means-plus-function limitation thus requires (1) identifying the function and (2) identifying the disclosed structure(s) that perform the recited function. *Asyst Tech., Inc. v. Empak, Inc.*, 268 F.3d 1364, 1369 (Fed. Cir. 2001). The function "is properly identified as the language after the 'means for' clause" and may not be improperly broadened by ignoring clear limitations contained in the claim language. *Lockheed Martin Corp. v. Space Systems/Loral, Inc.*, 324 F.3d 1308, 1319 (Fed. Cir. 2003). Structure identified in the specification is "corresponding" only if the "specification or prosecution history clearly links or associates that structure to the function recited in the claim." *Medical*

*Instrumentation and Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1210 (Fed. Cir. 2003); *Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, 296 F.3d 1106, 1113 (Fed. Cir. 2002). Moreover, the "corresponding structure must include ***all*** structure that actually performs the recited function." *Cardiac Pacemakers*, 296 F.3d at 1119 (emphasis added).

Where the specification describes the use of software to perform a claimed function of a means-plus-function limitation, it is error not to limit the corresponding structure to the algorithm of the software actually disclosed in the specification and equivalents thereof. *See WMS Gaming, Inc. v. Int'l Game Technology*, 184 F.3d 1339, 1348 (Fed. Cir. 1999); *Harris Corp. v. Ericsson Inc.*, 417 F.3d 1241, 1253-54 (Fed. Cir. 2005). In this instance, the corresponding structure is the specific algorithm the patent drawings illustrate. *WMS Gaming*, 184 F.3d at 1349.

Defendants have correctly applied all of these legal standards. First, Defendants have identified functions of the means-plus-function limitations by properly adopting the claim language itself. To the extent that terms and phrases within the recited functions require construction, Defendants have separately provided their constructions in Exhibit E and as discussed throughout this brief. Second, Defendants have identified the relevant structures that the specification links to, and are required to perform, the recited functions. Third, for those functions that are performed using software on a computer, Defendants have identified the algorithms disclosed in the specification that the disclosed computer system executes to perform those recited functions.

### (b)   DR's Constructions Violate the Controlling Legal Standards

Conversely, DR has failed to apply the appropriate legal standards. First, DR proposes functions that do not match the claim language. Instead of basing its constructions on a function that "is properly identified as the language after the 'means for' clause," *Lockheed Martin*, 324 F.3d at 1319, DR consistently disregards express claim limitations in order to manipulate the scope of the claim. *Cardiac Pacemakers*, 296 F.3d at 1113.

Second, DR's proposed structures fare no better. Initially, they are deficient because the functions upon which they are premised are flawed. Moreover, they are non-specific and fail to

refer to any particular structures described in the specification.  Further, they are incomplete because DR does not list all of the structures identified in the specification as performing the claimed function.  *Cardiac Pacemakers*, 296 F.3d at 1119.

Third, for those functions that are performed using software on a computer, DR merely identifies a general purpose computer without identifying the specific algorithms and data structures described and linked to recited functions in the '416 patent specification.  *See WMS Gaming,* 184 F.3d at 1348-49; *Harris Corp.*, 417 F.3d at 1253 (computer implemented means-plus-function terms limited to the algorithm disclosed in the specification).  In particular, DR's principal structure for a number of means-plus-function elements[11] consists of "a DOS-based personal computer, workstation, which has application processes written in the well-known C language."  DR's approach fails to identify the disclosed algorithms and data structures utilized by the computer to implement the claimed functions.

Because its proposals are essentially unbounded and contradict the guidance that has been established for interpreting means-plus-function elements, DR's proposals should be rejected.  *See Medical Instrumentation*, 344 F.3d at 1211 ("We cannot allow a patentee to claim in function terms essentially unbounded by any reference to what one skilled in the art would understand from the public record.")

　　　　　2.　　**"Means For Storing an Image Database Including a Plurality of Images of Anatomical Structures, the Images Being Separated Into a Plurality of Image Groups" (Claim 1)**

The parties agree that this clause is written in means-plus-function form and hence subject to 35 U.S.C. § 112, ¶ 6.  The parties, however, disagree as to the function and identification of the corresponding structure.

---

[11] See "application means…" (Claims 11, 14); "means…for retrieving…and displaying…" (Claim 1); "means for providing an output…" (Claim 1); "means for ordering the display…" (Claim 2); "means for synchronizing…" (Claim 3); "means for selecting an image…" (Claim 5); and "means…for retrieving…and displaying…" (Claim 6).

***Function.***  Defendants' proposed construction for the "image database" and "the images being separated into a plurality of image groups" are discussed in Sections III.F.5 and III.G.1.[12] Therefore, the function of this limitation is storing an image database including a plurality of images of anatomical structures, the images being separated into a plurality of image groups.

DR's proposed function, "to save information for later recall," is improper for at least two reasons.  First, the function identified by DR entirely disregards express language of the claim that the stored images be separated into a plurality of image groups.  Second, the function identified by DR seeks to broaden the storing aspect of the claimed function by suggesting that any "information" may be stored when the claim language is more narrowly directed to a particular image database.  *See Lockheed*, 324 F.3d at 1319; *Cardiac*, 296 F.3d at 1113 ("It is … improper to broaden the scope of the claimed function by ignoring clear limitations in the claim language.")

***Corresponding Structure.***  The proper structure for the function "storing an image database including a plurality of images of anatomical structures, the images being separated into a plurality of image groups" includes image database 24, IMAGE.dB files 55, PATIENT.db file 50, ROOTNAME.PAT files 53, and "conventional on-line storage devices." ('416 Patent, 5:17-23; 8:24-9:43.)  Specific files from image database 24 perform the aforementioned function of "storing an image database including a plurality of images of anatomical structures, the images being separated into a plurality of image groups."  For example, each ROOTNAME.PAT file 53 identifies an image group including one or more image series obtained during an examination. ('416 Patent, 8:40-42.)  Each image series in an image group in a ROOTNAME.PAT file 53 is indexed to a set of sequentially named files from IMAGE.dB files 55.  ('416 Patent, 8:42-52.)  These IMAGE.dB files 55 contain the actual anatomical images from different image series.  ('416 Patent, 8:42-45.)  Moreover, patient identification entries in PATIENT.db file 50 point to particular ROOTNAME.PAT files 53, and hence, particular image groups.  Accordingly, at least

[12] Defendants' proposed construction for "image database" is "stored image files, physician data tables, and indices."  Their proposed construction for "the images being separated into a plurality of image groups" is "assigning filenames to the images that identify the image group to which they belong."

ROOTNAME.PAT files 53, IMAGE.dB files 55, and PATIENT.dB file 50 are required by the specification to store the image database and to separate the stored images into a plurality of image groups. This claim element includes a number of additional limitations that specify how the data is organized. The specification indicates that these limitations are met by providing additional data structures, namely REF.DOCS file 52 and RADSTAFF.dB file 63. Data structures such as described above are more than mere abstraction and are specific structural elements in image database 24. *See In re Lowry*, 32 F.3d 1579, 1583-84 (Fed. Cir. 1994) (data structures are physical entities that impart a concrete organization on stored information and represent structural limitations that may not be ignored).

DR proposes structure corresponding to the "means for storing…" as simply "a storage device," which is improper for at least three reasons. First, as discussed above, DR improperly truncates the recited function by ignoring the express language of the claim. In doing so, DR fails to identify any structure that corresponds to the claimed image database and separation of images into groups. Second, DR merely identifies a component of a general purpose computer without identifying the particular data structures in the computer necessary to perform the recited function. This is legally incorrect. *Harris Corp.*, 417 F.3d at 1253.

Third, the '416 patent specification lacks description of DR's proposed "storage device" -- only the limitless phrase "conventional on-line storage devices" is used. ('416 Patent, 5:17-23; 8:24-9:43.) The specification does not provide "an adequate disclosure of what is meant by the claim language." *See Atmel Corp. v. Information Storage Devices, Inc.*, 198 F.3d 1374, 1378-79 (Fed. Cir. 1999) ("[I]f one employs means-plus-function language in a claim, one must set forth in the specification an adequate disclosure showing what is meant by the claim language.") Because DR failed "to set forth an adequate disclosure, [DR] has in effect failed to particularly point and distinctly claim the invention as required by the second paragraph of [35 U.S.C.] section 112." *Id.* If, as DR asks this Court to find, the corresponding structure for this lengthy means clause is merely any "storage device," DR's claim is indefinite and hence invalid.

### 3.   "Application Means…" (Claims 11, 14)

Claims 11 and 14 refer to an "application means" that performs a myriad of recited functions.  The parties agree that this clause is written in means-plus-function form and hence subject to 35 U.S.C. § 112, ¶ 6.  The parties disagree, however, as to the function and identification of the corresponding structure.

*Function.*  Defendants' proposed functions adopt the claim language and include each functional recitation.  Specifically, Defendants have identified the following functions:  1) displaying at least two image series of an image group indexed by the user-selected group identification; 2) formatting each image series for display on the monitor means in accordance with format preferences specified in fields of the diagnosing physician identifier; 3) displaying each image series on the monitor means in the order of its respective sequence in a respective display container such that each presentation area of the respective display container includes no more than one image[13]; and 4) outputting images from said at least two image series according to output preferences of a referring physician identified by a referring physician identifier indexed from the user-specified group identification.

DR again seeks to truncate and mischaracterize the claim language.  For example, DR improperly omits from functions 1) and 4) the requirement that the image groups are indexed from unique group identifications.  *See Lockheed Martin*, 324 F.3d at 1319.  The claim language corresponding to the first function of the application means reads "displaying at least two image series of an image group *indexed* by the user-selected group identification."  Though DR, in its corresponding function, indicates that information is "derived from…the group identification to recover at least two image series," that is different than using an index, as properly construed,[14] to

---

[13] The third and fourth functions indicated here are from claim 11.  Claim 14 recites a third function of "displaying each image series on the monitor means one image at a time in the order of its respective sequence in a respective presentation area," and a fourth function of "outputting images from said image group according to output preferences of a referring physician identified by a referring physician identifier indexed from the user-specified group identification."

[14] See section III.F.3.

20180/2040416.1

recover the two image series.  DR's proposed construction for the fourth function of the "application means…" is similarly deficient.

*Corresponding Structure.*   The corresponding structures that perform these functions are: image subsystem 14c; working memory 33; indexed object list 34; computer program implementing blocks 72-82 and the presentation mode procedure depicted in FIG. 7; computer program implementing the DONE functions that transfer a representation of the palette display container, as depicted in FIG. 8; monitor control blocks 100, 102, 103 of FIG. 9; PATIENT.dB file 50, ROOTNAME.PAT files 53; IMAGE.dB files 55, RADSTAFF.dB file 63, REF.DOCS file 52, and associated indexes, as depicted in FIG. 6; and output devices 23.[15]  Specifically, the language from the third function identified by the Defendants for the "application means…" of Claim 11 (*see* Ex. E, at E-3) mirrors the stipulated construction of monitor mode, indicating that Claim 11 is directed to the monitor mode of operating.[16]  In order to display image series in the monitor mode, the appropriate ROOTNAME.PAT file 53 is accessed so that the system may extract the image series contained in that file.  ('416 Patent, 8:58-65).  The MODE column from RADSTAFF.dB is used to specify that the monitor mode of operation should be implemented.  ('416 Patent, 9:27-34.)

With respect to the fourth function of the "application means…", in order to output images according to the output preferences of a referring physician, the '416 patent discloses that the system must perform a lookup in REF.DOCS file 52.  ('416 Patent, 9:12-14.)  The system determines which referring physician to lookup in REF.DOCS 52 by finding the referring physician that corresponds to the relevant examination in the PATIENT.dB file 50.  ('416 Patent, 9:12-14).  Accordingly, both PATIENT.dB file 50 and REF.DOCS file 52 are needed to output images according to output preferences of a referring physician.

---

[15] This structure corresponds to claim 11.  The corresponding structure in Claim 14 is the same except monitor control blocks 120, 121, and 122 of FIG. 11 replace monitor control blocks 101, 102, and 103; and the computer program implementing the DONE functions that transfer a representation of the palette display container is from FIG. 10 instead of FIG. 8.

[16] Similarly, the third function of the application means in Claim 14 mirrors the stipulated construction of "series mode," indicating that Claim 14 is directed to the series mode of operating.

20180/2040416.1

Further, with respect to Defendants' aforementioned fourth function, DR's function only provides for processing information in preparation for outputting images, and does not provide for the actual output of the images, which is contrary to the claim language. The '416 patent uses output devices 23, such as a full grey scale printer, facsimile, or modem, to output images to a referring physician based on that physician's output preferences. ('416 Patent, 13:41-50.) Thus, all of the structures identified by Defendants are required to perform the recited function and properly included as part of the claimed device.

DR's structure includes a general purpose computer, i.e. "application process written in the well-known C language," but ignores the specific algorithms, data structures, and output devices described and linked to recited functions in the '416 patent specification. *See WMS Gaming*, 184 F.3d at 1348-49; *Harris Corp.*, 417 F.3d at 1253 (computer implemented means-plus-function terms limited to the algorithm disclosed in the specification).

### 4. "Means…For Retrieving at Least One Image Series of an Image Group Indexed by the Group Identification and for Displaying the at Least One Image Series in One or More Presentation Areas of the Plurality of Presentation Areas in a Display Format Contained in the Physician Data Tables" (Claim 1)

The parties agree that this clause is written in means-plus-function form and hence subject to 35 U.S.C. § 112, ¶ 6. The parties disagree, however, as to the function and identification of the corresponding structure.

*Function*. Consistent with the claim language, Defendants have identified the function as "retrieving at least one image series of an image group indexed by the group identification and displaying the at least one image series in one or more presentation areas of the plurality of presentation areas in a display format contained in the physician data tables."

Similar to the flaws described above with respect to the "application means," DR truncates the function present in the claim language by ignoring limitations, including the concept of indexing. (Ex. E., at E-8.) Defendants' function provides for those concepts and should be adopted. (Ex. E., at E-8.)

*Structure.*  The corresponding structures for the recited functions include: monitors 26, 27, 28; low level video controller 14d; screen driver 14b; image subsystem 14c; coupling mechanism 29 in the form of a video card which has separately accessed and separately controlled memories (29a, 29b, 29c) for Red, Green, and Blue pixels; working memory 33; indexed object list 34; computer program implementing blocks 72-82 and the presentation mode procedure depicted in FIG. 7; monitor control blocks 100, 102, 103, 120, 121, 122 of FIGS. 9 and 11; IMAGE.db files 55, ROOTNAME.PAT files 53, PATIENT.db file 50, RADSTAFF.db file 63, and associated indexes, as depicted in FIG. 6.  Each of these structures properly falls within the claim limitation because they are required to perform the functions:  (1) retrieving at least one image series of an image group that is indexed by the group identification, and (2) displaying the at least one image series in one or more presentation areas in one or more presentation areas of the plurality of presentation areas in a format contained in the physician data tables.  (*See, e.g.*, '416 Patent, 4:60-5:3; 5:55-6:1; 6:36-46; 8:24-10:25.)

DR fails to cite any of the data structures that comprise the image database, ignores the specific algorithms set forth by the '416 patent, and omits the monitor control blocks (100, 102, 103, 120, 121, 122) that are disclosed by the '416 patent.  Instead, DR seeks to impermissibly broaden the structure to a general purpose computer.  (Exh. E., at E-8); *WMS Gaming,* 184 F.3d at 1348-49; *Harris Corp.*, 417 F.3d at 1253

### 5. <u>"Means for Providing an Output from the System According to an Output Function Specified In the Physician Data Tables" (Claim 1)</u>

The parties agree that this clause is written in means-plus-function form and, therefore, subject to the requirements of 35 U.S.C. § 112, ¶ 6.  The parties disagree, however, as to the function and identification of the corresponding structure.  This disagreement arises because DR seeks to rewrite Claim 1, and the "means for providing an output" limitation, to refer to displaying images according to the diagnosing physician's display format in the physician data tables, which is provided for by the "means…for retrieving…and for displaying…" as noted above in Section

III.I.4.  However, as properly construed, this limitation refers to providing an output according to the referring physician's output functions.

   *Function.*  Defendants have identified the function for the "means for providing an output…" as "providing an output from the system according to an output function specified in the physician data tables."  As explained in Section III.E.3 above, and as required by the intrinsic evidence, the recited function should be construed to mean "automatically transferring a representation of a palette display container, including images, to a referring physician outside of the system in accordance with the output function stored in the physician data tables for that referring physician when the diagnosing physician indicates that his examination is complete."

   *Corresponding Structure.*  Because the claim limitation requires providing an output - not displaying - the proper corresponding structure for this claimed function includes output devices 23 (including a full grey scale printer, a facsimile machine, and a modem).  ('416 Patent, 5:3-8.)  These output devices are used upon execution of the DONE functions (i.e., output functions) in order to print out a copy of the working palette display container, fax a copy of the working palette display container, or transmit a data representation of the working palette monitor through a modem.  ('416 Patent, 13:41-50.)

   Additionally, the specification discloses a specific process performed by a computer program when implementing the DONE functions.  ('416 Patent, 13:41-50.)  Accordingly, the computer program that implements the DONE functions should be construed as part of the structure that corresponds to the aforementioned identified function.  *See WMS Gaming,* 184 F.3d at 1348-49; *Harris Corp.*, 417 F.3d at 1253.  In order to determine which DONE function is executed, the '416 patent uses PATIENT.dB file 50 and REF.DOCS file 52.  ('416 Patent, 9:12-20.)  These structures should also be identified structure.  *Id.*

   DR again misidentifies the structure as merely a general purpose DOS-based personal computer that is generically programmed to perform the recited function.  Such a generic identification of structure is contrary to well-established law and should be rejected.  *Id.*

6.  **"Means For Ordering the Display…", "Means For Synchronizing…", "Means for Selecting an Image…" (Claims 2, 3, 5)**

*Function.* The parties agree on the functions for the "means for ordering the display…", "means for synchronizing…",and "means for selecting an image…" limitations, which are found in dependent Claims 2, 3, and 5, respectively.  (Exh. E., at E-10, 11, 12).

*Structure.*  With respect to corresponding structures, Defendants have identified those structures from the specification that are associated with each of the aforementioned functions.[17] In contrast, DR fails to cite any of the data structures that comprise the image database, ignores the specific algorithms set forth by the '416 patent, and omits the monitor control blocks (100, 102, 103, 120, 121, 122) that are disclosed by the '416 patent.

7.  **"Means…For Retrieving Images from the Image Database and Displaying Retrieved Images in the at Least One Display Container" (Claim 6)**

The "means…for retrieving images from the image database and displaying retrieved images in the at least one display container" disclosed in Claim 6 is required by the claim language to be "connected to the storage subsystem and to the at least one display container."  The parties agree that a display container is "a bounded area or window in which images are presented."  (JCCC, p. 2.)  Because the specification describes no structure that is connected to both a storage subsystem and a bounded area or window in which images are presented, the aforementioned "means…for retrieving images…" is indefinite.

Nevertheless, if the "means…for retrieving images…" is found to be definite, Defendants assert that the function is "retrieving images from the image database and displaying retrieved images in the at least one display container," which mirrors the claim language.  Defendants' corresponding structure is listed in the Exhibit E at E-13.

---

[17] Even though Defendants have identified specific structure described in the specification as pertaining to the synchronizing function, the specification does not disclose structure adequate to synchronize as required by the claim.  Accordingly, the "means for synchronizing…" is indefinite. Defendants' structure is provided in case the term is found to be definite.

1

## IV.    CONCLUSION

2

For the foregoing reasons, Defendants respectfully request that the Court construe the

3

identified phrases in the '416 patent claims as Defendants propose.

4

5      DATED:  January 19, 2007                 Respectfully submitted,

6                                              QUINN EMANUEL URQUHART OLIVER &
                                               HEDGES, LLP
7

8

9                                              By /s/     Victoria F. Maroulis
                                                  Frederick A. Lorig
10                                                Steven M. Anderson
                                                  Victoria F. Maroulis
11                                                David T. Pollock
                                                  Attorneys for Defendant GE HEALTHCARE
12                                                LTD., GE MEDICAL SYSTEMS
                                                  INFORMATION TECHNOLOGIES, INC.
13

14     DATED:  January 19, 2007                 Respectfully submitted,

15                                              BAKER BOTTS LLP

16

17                                              By /s/        Jeffrey D. Sullivan
                                                  Robert C. Scheinfeld
18                                                Jeffrey D. Sullivan
                                                  Robert L. Maier
19                                                Attorneys for DEFENDANT FUJIFILM
                                                  MEDICAL SYSTEMS USA, INC
20

21     DATED:  January 19, 2007                 Respectfully submitted,

22                                              SCHIFF HARDIN LLP

23

24                                              By /s/          W. Paul Schuck
                                                  W. Paul Schuck
25                                                Stephen Hankins
                                                  Attorneys for Defendant EASTMAN KODAK
26                                                COMPANY

27

28

1

DATED:  January 19, 2007

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

REED SMITH LLP

By /s/      Jonah D. Mitchell
       Scott D. Baker
       John P. Bovich
       Doyle B. Johnson
       Jonah D. Mitchell
       Attorneys for DEFENDANT SIEMENS
       MEDICAL SOLUTIONS U.S.A, INC., SIEMENS
       CORPORATION AND SIEMENS AG

DATED:  January 19, 2007        Respectfully submitted,

FISH & RICHARDSON P.C.

By /s/      John D. Hamann
       Nagendra Setty
       John D. Hamann
       Attorneys for Defendant MCKESSON
       INFORMATION SOLUTIONS, LLC

DATED:  January 19, 2007        Respectfully submitted,

FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER, LLP

By /s/      Steven M. Anzalone
       Steven M. Anzalone
       Scott R. Mosko
       Frank A. DeCosta
       Walter D. Davis
       Attorneys for Defendant PHILIPS
       ELECTRONICS NORTH AMERICA
       CORPORATION

42

DEFENDANTS' CORRECTED OPENING CLAIM CONSTRUCTION BRIEF
CASE NO. 06 CV 0417 B(NLS)

DATED:  January 19, 2007          Respectfully submitted,

                                  BLANK ROME LLP


                                  By /s/        Laurence S. Shtasel
                                     Laurence S. Shtasel
                                     H. Keeto Sabharwal
                                     Katherine P. Barecchia
                                     Attorneys for Defendant DYNAMIC IMAGING,
                                     LLC

DATED:  January 19, 2007          Respectfully submitted,

                                  LEYDIG, VOIT & MAYER, LTD.


                                  By   /s/     H. Michael Hartmann
                                     H. Michael Hartmann
                                     Wesley O. Mueller
                                     Robert T. Wittmann
                                     Attorneys for Defendants, AGFA-GEVAERT
                                     N.V. and AGFA CORPORATION

DEFENDANTS' CORRECTED OPENING CLAIM CONSTRUCTION BRIEF
CASE NO. 06 CV 0417 B(NLS)

20180/2040416.1

1

**DR Systems, Inc. v. Fujifilm Medical Systems, USA, Inc., _et al_,**
**Case No. 06-cv-417 B (NLS)**

2

3

**Certificate of Service**

4

5        The undersigned hereby certifies that all counsel of record who are deemed to have

6    consented to electronic service are being served this 19th day of January, 2007, with a copy of this

7    document via the Court's CM/ECF system.  I certify that all parties in this case are represented by

8    attorneys who are CM/ECF participants.

9

10

11                                          ___/s/ David T. Pollock_____

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

20180/2040416.1

44

DEFENDANTS' CORRECTED OPENING CLAIM CONSTRUCTION BRIEF
CASE NO. 06 CV 0417 B(NLS)